**DUCK RIVER PRESERVATION ASSOCIATION, Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY et al., Defendants.**

**Civ. A. No. 1130.**

United States District Court, E. D. Tennessee, Winchester Division.

March 3, 1974.

Memorandum and Order as to Stay May 2, 1974.

Order Extending Stay June 25, 1974.

Order Denying Relief Nov. 6, 1974.

Frank M. Fly, Murfreesboro, Tenn., and Robert S. Brandt, Nashville, Tenn., for plaintiff.

Herbert S. Sanger, Jr., Gen. Counsel, Thomas A. Pedersen, Knoxville, Tenn., Lon P. MacFarland, Columbia, Tenn., for defendant.

## MEMORANDUM OPINION

NEESE, District Judge.

The plaintiff applied to this Court for declaratory relief and to enjoin the defendant Tennessee Valley Authority (TVA) and its chairman Mr. Aubrey J. Wagner from continuing with the construction of its Duck River project and various appurtenant works comprised of the Columbia dam and reservoir in Maury and Marshall counties, Tennessee and the Normandy dam and reservoir in Bedford and Coffee counties, Tennessee. The Court's jurisdiction was properly invoked under the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831, et seq., especially 16 U.S.C. § 831c(b); 28 U.S.C. § 1361; 28 U.S.C. §§ 2201, 2202; and the review provisions of 5 U.S.C. §§ 701–706. The Court advanced trial on the merits and consolidated it with the hearing on the plaintiff's application for an injunction, Rule 65(a)(2), Federal Rules of Civil Procedure, devoting five days thereto on January 14–18, 1974.

In its present state, the Duck River is an unregulated stream some 290 miles long which serves as a major source of water supply for the area which it traverses and is devoted to recreational purposes such as canoeing and floating. It has a diverse fish fauna. A large number of amphibian, reptile, mammal and bird species are presently found in the terrestrial habitat of the river valley. The Duck River is included in neither the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, et seq., nor the Tennessee Scenic Rivers Act of 1968, T.C.A. §§ 11–1401, et seq. Considerable evidence reflects that the upper valley of the river has been inhabited by Man for some 10,000 years, and 50 prehistoric Indian sites in the area have been surveyed and recorded.

In the year 1964, a group of citizens in the river area formed the Upper Duck River Development Association and sought the aid of TVA in relation to certain water problems therein. The following year the General Assembly of Tennessee created the Tennessee Upper Duck River Development Agency (TUDRDA), Tennessee Public Acts of 1965, ch. 80; cf. T. C. A. § 13–1408, to formulate and execute programs to develop the resources of the area, and one year afterward the Tennessee State Planning Commission designated the directly affected four-county (Bedford,

Coffee, Marshall and Maury) area as a planning region, creating the Upper Duck Regional Planning Commission as the operating branch of such developmental effort. Plans for the Duck River project were completed in September, 1968 with the issuance of TVA's project planning report no. 65–100–1, which was supplemented the following October. TVA submitted its budget program for the fiscal year 1970 to the Congress in January, 1969. The Congress appropriated initial funds for the project on December 11, 1969 and made further appropriations therefor for the fiscal years 1971, 1972, 1973 and 1974. On July 1, 1971, TUDRDA entered into a contract with TVA, *inter alia*, to repay TVA $16,-200,000 for the costs of the project attributable to water supply, and TUDRDA entered into contracts with the appropriate agencies of the cities of Columbia, Lewisburg, Manchester, Shelbyville and Tullahoma, Tennessee to fulfill its obligations to TVA. Monies are currently being paid into a trust fund for the federal government under the agreement of TUDRDA and TVA.

The plaintiff Duck River Preservation ASsociation (DRPA) is incorporated by Tennessee as an association of citizens and residents of the state of Tennessee and other states. The defendant TVA is a United States corporation, *City of Tullahoma, Tenn. v. Coffee County, Tenn.*, D.C.Tenn. (1962), 204 F.Supp. 794, reversed on other grounds, C.A. 6th (1964), 328 F.2d 683, and is an agency of the United States, *United States v. Pressnell*, C.A. 6th (1964), 328 F.2d 580, 581. The intervening defendants the cities of Columbia, Shelbyville, Tullahoma and Lewisburg, Tennessee are Tennessee municipal corporations, and the board of public utilities of the city of Columbia, the Tullahoma utility board, and the Shelbyville power, water and sewerage board are agencies of those respective municipal corporations. The intervening defendant TUDRDA is a Tennessee corporation.

The plans for such project contemplate the location of Normandy dam at river mile 248.6, about eight miles north of Tullahoma, and a resulting reservoir which will cover at normal maximum pool elevation, 3,200 acres, extending upstream mostly in Coffee County some 17 miles. They contemplate the location of Columbia dam at river mile 136.9, about two miles upstream from Columbia, and that resulting reservoir will cover at normal maximum pool elevation, approximately 12,600 acres mostly in Maury County. Such dam will consist of two rolled earth-fill embankments of an aggregate length of 2,075 feet and of a height of some 80 feet above the flood plain. About 31,800 acres are to be acquired for the Columbia project.

The two reservoirs will impound about 71 miles of the river and will flood permanently a total of approximately 15,800 acres of the 24,000 acres to be set aside within the maximum reservoir flood zones. Approximately 17,100 additional acres of land will be acquired to carry out the purposes of the project above the maximum flood elevation. Relocation of 396 families will be required to consummate the project. Neither waterfalls, nor the Duck River cache, nor the Old Stone Fort will be inundated. The project will create water-oriented recreational opportunities not presently available on the river. No hydroelectric facilities are included in the plans at either dam.

As the project will alter the ecological and aesthetic characteristics of the present river, TVA undertook compliance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332. On June 30, 1971, TVA issued and sent to the Council on Environmental Quality (CEQ) and made available to the public its draft statement on the environmental impact of the Duck River project. A public hearing was conducted in Columbia on August 24, 1971, at which the plaintiff DRPA offered testimony, which was included in the hearing record. TVA issued its final environmental impact statement (eis) for this project on April 28, 1972 and sent it to CEQ three days afterward. Construction of the

project was commenced on June 7, 1972 and has been proceeding since that time.

■ TVA was required to prepare, *inter alia,* a detailed statement of the environmental impact of this project that might significantly affect environmental quality. NEPA, § 102(2)(C), 42 U.S.C. § 4332(2)(C). NEPA § 102, "* * * by establishing specific procedures to be followed, makes it possible for courts to determine objectively whether federal officials have carried out the mandate of [the] Congress to accord a high priority to environmental factors. * * *" *Environmental Defense Fund v. Tennessee Val. Auth.* (Tellico Dam case I), C.A. 6th (1972), 468 F.2d 1164, 1175[6]. "* * * [T]he mere filing of a document labeled 'final impact statement' is insufficient to shield an agency from judicial review if the document fails to comply with the standards outlined in NEPA. * * *" *Students Challenging Reg. Agency Pro. v. United States* (SCRAP), D.C.D.C. (1972), 346 F.Supp. 189, 195 n. 8. "* * * [A]n impact statement should contain 'all possible significant effects on the environment.' * * *", *Sierra Club v. Froehlke* (Trinity River case), D.C.Tex. (1973), 359 F.Supp. 1289, 1342, although "* * * NEPA * * * does not require perfection, nor the impossible. * * *" *Environmental Defense Fund v. T. V. A.,* (Tellico Dam case II), C.A. 6th (1974), 492 F.2d 466, 468.[1]

The plaintiff's principal objections to the final eis may be fairly summarized to claim: (1) it does not fully disclose the impact of the Duck River project on agriculture; (2) it does not fully disclose the impact of the project upon recreational activities available; (3) it does not disclose the effect of the project on the plant life of the upper Duck River region; (4) it does not disclose the environmental effects of the secondary development which TVA asserts will result from the project; (5) it does not fully disclose the impact of the project upon the aquatic habitat of the Duck River and its tributaries; (6) it does not fully

disclose the impact of the project upon wildlife; (7) it does not adequately disclose the impact of the project upon water quality; (8) it does not adequately disclose alternatives, and their environmental effect; (9) it does not adequately consider responsible public and private comment; (10) it explains the economics of the project based upon outdated economic data, and TVA did not subsequently recompute this analysis; and (11) TVA never undertook a good faith consideration of the impact of the project.

■ This Court will first determine if TVA reached its decision to proceed with the construction of this project after a full, good faith consideration of the environmental factors, and will then determine, according to the standards set forth in NEPA, §§ 101(b), 102(1), whether "* * * 'the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values.' * * *" *Environmental Defense Fund v. Corps of Eng., U. S. Army,* C.A. 8th (1972), 470 F.2d 289, 300[13]. Albeit, this Court limits the standard of its review within these perimeters and specifically does not substitute its judgment in the premises for that of TVA. *Idem.; Citizens to Preserve Overton Park v. Volpe* (1971), 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 153[25].

Except for the matters noted, *infra,* TVA's eis, under consideration here, is as thorough and complete on the pertinent features as could reasonably be expected. It presented in most instances the considerable ecological damage and disturbance this multiple-purpose project will cause as well as the offsetting economic and social benefits which will result. See *Tellico Dam case II, supra.*

■ The plaintiff asserts that TVA dealt inadequately in its eis with the comments of the public on the draft eis. Appendix B thereof, comprised of 53 pages, sets forth verbatim the comments of federal, state and local agencies and

---

1. No. 74–1139, decided and filed February 22, 1974, slip sheet at p. 3, fn. 1.

TVA's responses to each of them. Appendix B thereof, comprised of 71 pages, sets forth synopses of public comments received. At the aforementioned public hearing on the project, 56 written comments were offered into the record, and 119 additional comments were received by TVA by mail. Although all the comments from the general public were not included, the synoptic range which was included appears to this Court to have brought to the attention of TVA's officials and specialists a full circle of the criticisms, objections and suggestions concerned in the project. This enabled TVA, in the light of such comments, to "* * * take the 'hard look' at environmental consequences mandated by Congress by giving individualized consideration and balancing of environmental factors * * *". *Trinity River case, supra,* 359 F.Supp. at 1357[71].

■ There are errors in some of the computations of TVA in the water quality section of its eis, but the Court finds that these errata resulted principally from errors in projecting future population growth. Despite such errata, this Court finds that TVA's specialists had sufficient information to give full and good faith consideration to the environmental factors involved, and that the actual balance of costs and benefits that was struck in this regard was not arbitrary but gave sufficient weight to the environmental values.

■ There is no merit to the plaintiff's contention that TVA violated the CEQ Guidelines, 10(b), 36 Fed.Reg. 7725–7726 (1971), by ordering construction to commence on the project " * * * sooner than thirty (30) days after the final text of an environmental statement (together with comments) has been available to the Council and the public. * * *" Such guideline applied only to draft environmental statements " * * circulated after June 30, 1971 * * *", *ibid.,* at page 7724; the draft eis was issued on June 30, 1971, and construction on the project did not commence until June 7, 1972.

■ The plaintiff claims that the impact of the project on unique groupings of true cedar glades in the area to be inundated was not fully disclosed; however, there was sufficient mention of this impact on the environment to provoke further inquiry on the part of those most concerned. In addition, the evidence reflected that many acres of cedar glades, which although perhaps not of the same groupings, will remain in the general area in which the reservoirs will be located.

TVA's eis made sufficiently detailed explorations of the alternatives to the action proposed to be continued as required by 42 U.S.C. § 4332(C) (iii). TVA also gave a good faith consideration of taking no action at pp. 27–28. *Calvert Cliffs' Coord. Com. v. United States A. E. Com'n,* (1971), 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114; *Trinity River case, supra,* 359 F.Supp. at 1344 [40–44].

■ The plaintiff claims further that there is incorrect or inadequate disclosure of the impact upon the aquatic habitat and life of the Duck River and its tributaries. Except that the eis failed to disclose that one species of naiad mollusk may be rendered extinct by the impoundments of water of the Duck River, the eis passes muster on these accounts.

■ The most glaring significant factor on the environment produced by this project which was excluded from TVA's eis relates to its impact upon agriculture and agriculturally-related business volume. It is stated in the eis (at page 5), *inter alia* :

* * * * * *

* * * One effect of the proposed project would be to enhance the opportunity for attracting nonagricultural jobs to the area. A key factor in this effort would be an increased supply of water of good quality (appendix F). As a result of this program, there will be a *shift* in the use of some land from agriculture or forest to cities or industry. In addition, some proportion of the population could be expected to

move from rural areas into the cities of the region. [Emphasis supplied.]

\* \* \* \* \* \*

Of the land being acquired for the project, about 21,000 acres is in classes I, II, and III. The four-county area has a total of 523,000 acres of land in these classes \* \* \*. Of the total land being acquired for the project, about 34 percent is class I and II land, 17 percent is class III land, and 11 percent is class IV land.

Farm sales amounted to about $32 per acre in 1964, and the figure is probably somewhat higher now. The project lands account for about 5.5 percent of the agricultural production in the four-county area. The *changes in land use* associated with the project *will* thus *reduce agricultural production* in the four-county area, but these losses *will be offset many times over* by the economic gains that will result from this project. [Emphasis supplied.]

\* \* \* \* \* \*

This was not a sufficiently detailed explication of the impact of the project on the shift in land use from agriculture or forest to cities and industry, and the last sentence of the quoted statement is conclusory. Eis explications which are overly conclusory in nature are rejected by reviewing courts. *Cf. Daly v. Volpe*, D.C.Wash. (1972), 350 F.Supp. 252, 259.

TVA computed (at page 41 of its eis) as annual benefits of the project an aggregate of $5,275,000 based upon an interest rate of 4½%, an economic service life of 100 years, and used 1969 price levels. However, it did not reveal in its eis that unavoidable losses in sales of farm products in the four-county area, due to the shifting of land from agricultural production and the resulting losses from farm-dependent business volume, will amount to $4,600,000 each year. (Exhibit no. 137; see exhibit no. 1–T).

There was TVA intra-agency information to this effect available at the time TVA issued its eis. Mr. H. A. Anderson, an agricultural economist in TVA's agricultural resource development branch, advised by memorandum of March 15, 1972, a revision of TVA's eis draft, as follows:

\* \* \* \* \* \*

\* \* \* Add, "While agriculture does not have great potential for increased employment, it has been growing rapidly in income and has potential for future growth. Farm income has been growing 2 percent per year, and TVA studies show that it has potential for increasing, at least 60 percent over what it is now."

\* \* \* \* \* \*

Add \* \* \*—

\* \* \* "At the same time efforts are being made to capture the benefits from the project, substantially equally diligent efforts need to be made to minimize unavoidable adverse effects of it. *Unavoidable losses in farm sales due to land to be taken from farm production amount to about $1.3 million. Farm-dependent business in the counties will likewise lose about $3.3 million in business volume.* While *these losses are unavoidable*, planning can minimize further losses due to induced development if expanded activities and future growth are guided to land that does not have farm potential. In fact, with proper location of future growth, some of these losses may be recouped if displaced farmers can be guided to presently unused land with farm potential. General areas of agricultural suitability are shown on sketch map, and detailed areas can be developed from published soil survey maps." (Emphasis supplied.)

Exhibit no. 137.

The Congress mandated that "\* \* \* all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) *include* in every recommendation or report on \* \* \* major Federal actions significantly affecting the quality

of the human environment, a *detailed* statement by the responsible official on—

\* \* \* \* \* \*

(ii) *any adverse environmental effects which cannot be avoided* should the proposal be implemented \* \*." (Emphasis supplied.)

42 U.S.C. § 4332(2).

■ The decision not to include in the final eis this significant detailed information on the adverse environmental effects on agriculture and agriculturally-related business, which cannot be avoided, was made by TVA's board of directors on the recommendation of its general manager Mr. Lynn Seeber, after Dr. Lewis B. Nelson, manager of agriculture and chemical development for TVA, and all other affected TVA division heads had approved the eis in its final draft form. Mr. Seeber testified that he had earlier called for a revision of a previous draft of this eis statement to bring into better balance the "good" of the project with the "bad". He stated that he eliminated as misleading and unrealistic the foregoing proposed detailed information of unavoidable losses because: (1) it assumed that the affected farmers would be taken out of farming forever, whereas the computations at table E–9 of the eis reflected that idle and less-than-fully-utilized cropland was available in the four-county area, and (2) even if farming units were destroyed by the construction of the project, such loss would be compensated for by the benefits of industrial development, thus erasing any losses.

This Court finds that such administrative reasoning does not comport with NEPA. " \* \* \* The legislative history of NEPA clearly reveals that Congress intended the 'development of adequate methodology for evaluating the full environmental impacts and the *full* costs—social, *economic*, and environmental—of federal actions.' \* \* \* " (Emphasis supplied.) *Trinity River case, supra,* 359 F.Supp. at 1366[83]. TVA had developed a methodology for evaluating

the benefits of this project and had within its expertise a methodology for evaluating the economic "dis-benefits" of the project, as they pertained to agriculture and agriculturally-related losses; but its officials decided to disclose in TVA's eis the former, while failing to disclose the latter. " \* \* \* NEPA is at the very least 'an environmental full disclosure law,' \* \* \* ", *ibid.,* 359 F.Supp. at 1338[32], and " \* \* \* the courts must see that important legislative purposes are not lost or misdirected in the vast hallways of the federal bureaucracy. \* \* \* " *Ibid.,* 359 F.Supp. at 1332[22]. Where methods exist for evaluation of environmental losses, an agency should utilize them. *Cf. Environmental Defense Fund v. Tennessee Valley Authority* (Tellico Dam case II), D.C.Tenn. (1973), 371 F.Supp. 1004, 1010, 6 E.R.C. 1008, 1014[3].

■ Another factor, not detailed sufficiently in TVA's eis, related to an estimated cost of $1,632,466 in relocating, under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4601, et seq., some 396 families to be displaced by the project. Neither the revelations at page 26 of the eis nor the additional detailed information in appendix D thereof disclose this cost. Families affected by the impact of the project became eligible for the benefits of such Act any time after January 2, 1971, 42 U.S.C. § 4601(6), approximately 16 months before TVA issued its eis. TVA advanced no viable explanation for this omission.

■ Although couched in guarded language, there is a strong implication in this eis (at page 21) that, to mitigate the environmental impact of this project on the wildlife of the area, a wildlife management area would be provided near the Normandy reservoir. It is stated that " \* \* \* it would be desirable *to* develop \* \* \* " such a management area, and that " \* \* \* TVA would work with the State [of Tennessee] *to* determine \* \* \* " [emphasis supplied] the manner of making such a development and the precise acreage it would

include. Although Mr. Seeber testified that the provision of this management area continues in the discussion stage and has not yet been implemented only because neither TVA nor the state of Tennessee has located money with which to fund the undertaking, personnel of TVA's fisheries and waterfowl resources branch appear to have been under the impression that such proposal had been abandoned. Whether there will be a managed area to protect and preserve the wildlife disturbed by the project is a significant factor on its impact upon this part of the environment, and TVA's eis should have provided more " * * * comprehensive, objective information * * * ", *Tellico Dam case I, supra*, 468 F.2d at 1180, concerning the true status of the matter. Indeed, TVA's director of forestry, fisheries, and wildlife development, admonished those in charge of preparing the eis that, " * * * [t]o be more honest * * * " the pertinent section of the eis should be made to read: "About 1,000 acres of this area is included in the proposed TVA project development purchase boundary. The remaining 3,000 acres, *if* acquired, shall provide the management base possible to mitigate for the upland wildlife habitat lost as a result of the project. *Funds* for this purchase *are not included* in the present project cost estimate, *however.*" (Emphasis supplied.)

■ The impact of the project on the recreational use of the Duck River was not fully disclosed. For example, TVA's specialists in the special studies section of its recreation resources branch worked out a methodology to estimate the impact of the project on demands for canoeing and floating. It revealed that at the present time some 17,000 visits are being made each year for these purposes, that in a fully-developed state the 71 affected miles of the Duck River would have had an annual potential of about 102,000 visits for this purpose, and that the demand for such recreational use would exceed the opportunities remaining after the project before the year 2000. (Exhibit no. 113).

■ This Court rejects the argument of the plaintiff that TVA was required to recompute continually the benefit-cost ratio of the project involved. This calculation was accomplished in the manner required by the Flood Control Act of 1936, 33 U.S.C. §§ 701, et seq., and Senate Document no. 97, is a legislative matter, and is not subject to judicial review. *Tellico Dam case II, supra.* TVA was only required in its eis to " * * * reappraise the costs and benefits of the project in the light of the policies of environmental protection found in NEPA. * * * " *Environmental Defense Fund, Inc. v. Froehlke*, C.A.8th (1972), 473 F.2d 346, 356[11]. It included in its eis the benefit-cost ratio on the basis of which the project was approved and advanced therein its reappraisal thereof in the light of NEPA.

The Court has considered the claims of the plaintiff of other alleged inadequacies and inaccuracies in TVA's eis and finds them to lack merit. It is believed that the foregoing discussion is all that is necessary to a decision of this lawsuit.

The Court finds that the defendants TVA and Mr. Wagner did not reach their decision to proceed with the construction of this project after a full, good faith consideration of the environmental factors aforementioned. However, the Court cannot say that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental matters: the fatal defect in the eis was in the failure to disclose fully therein all the information TVA had available in balancing the benefits and "dis-benefits" of the project in the light of the environmental values involved.

■ The Court concludes and declares that, since the aforenamed defendants have not complied sufficiently with the salient provisions of NEPA, they are proceeding in excess of their statutory authority; that compliance with the requirements of NEPA is a condition precedent to such defendants' exercise of their authority to proceed with the Duck

River project, since such project is a " * * * major Federal actions significantly affecting the quality of the human environment * * * " within the meaning of NEPA, § 102(2)(C); that, unless restrained, such defendants will proceed with such project in an unauthorized manner; that the plaintiff has no adequate remedy at law and will be irreparably damaged if such defendants are not enjoined from proceeding with such project; and that the eis filed by the defendant TVA is not a sufficiently " * * * detailed statement * * * " within the contemplation of NEPA, § 102(2)(C). (These conclusions are in addition to the earlier findings of fact and conclusions of law included herein or in previous memoranda of this Court.)

Judgment will enter enjoining the defendants Tennessee Valley Authority and Mr. Aubrey J. Wagner, after the plaintiff has executed and filed an injunction bond in the penalty of $100.00 in accordance with Rule 65, Federal Rules of Civil Procedure, from proceeding with the construction of the Duck River project after midnight, March 30, 1974, until a revised environmental impact statement with regard thereto[2] has been filed, agreeably with the pertinent provisions of the National Environmental Policy Act, the current guidelines of the Council on Environmental Equality and of the Tennessee Valley Authority itself. Such judgment will provide also that this Court will retain jurisdiction of this matter to rule upon the sufficiency of the revised environmental impact statement, if a prompt request for such review is made, and also to consider any application of the defendants for exceptions to the comprehensiveness of such injunction. Rule 58(1), Federal Rules of Civil Procedure.

**2.** Although the plaintiff has been overly technical and hypercritical in much of its criticisms of this eis, TVA would be well advised to consider such criticisms as it prepares a revised eis on this project.

* In their brief, the defendants state, *inter alia*:
At the hearing on April 1, 1974, the Court ordered TVA to correct the deficiencies

### MEMORANDUM AND ORDER AS TO STAY

This Court, having STAYED on April 1, 1974 until midnight, May 4, 1974 the effectiveness of its injunction herein of March 7, 1974; it having been represented by defense counsel that the defendant Tennessee Valley Authority (TVA) on April 19, 1974 filed with the Council on Environmental Quality (CEQ) a revised environmental impact statement on its Duck River project; it appearing that a period of 45 days from April 19, 1974 is required to permit the CEQ and other appropriate governmental agencies and the public, including the plaintiff, to comment upon such revised statement after which a final revised environmental impact statement is to be filed; and, it appearing to the Court that the TVA has been reasonably diligent in preparing, filing and circulating such revised statement: it hereby is

ORDERED that this Court's injunction herein of March 7, 1974 hereby is STAYED again until midnight, June 29, 1974. There being no opposition thereto by the plaintiff, it hereby is ORDERED to submit its comments on such revised statement to TVA no more than 45 days from April 19, 1974.

The plaintiff's respective motions objecting to a further stay of the injunction herein, to terminate same, and to require TVA to remove appendix B from such statement, hereby are DENIED. The defendants' request for oral argument of their current motions hereby is DENIED.

By these actions, this Court expresses no view as to whether the defendant TVA has yet complied to this point with the National Environmental Protection Act of 1969, 42 U.S.C. § 4332.*

found by the Court in the Duck River EIS as diligently as possible in accordance with the requirements of NEPA and the CEQ guidelines. The Court stayed the effective date of the injunction to May 4, 1974, to permit such compliance * * *.
This Court did not at that or any other time order TVA to correct any deficiencies and did not stay the injunction to permit compliance

## ORDER EXTENDING STAY

The defendants herein having moved the Court for an extension of the stay of the injunction herein of March 19, 1974, it is hereby

ORDERED the effectiveness of the injunction herein of March 19, 1974 is stayed until midnight, July 1, 1974 and that this matter is set for hearing on Monday, July 1, 1974 at 2:00 p. m., or as soon thereafter as it can be reached on the Court's calendar.

All other matters are hereby RESERVED.

## ORDER DENYING RELIEF

It appearing to the Court that the defendant Tennessee Valley Authority has now complied herein with the pertinent provisions of the National Environmental Policy Act, and that the plaintiff is entitled to no further relief:

All outstanding motions herein hereby are DENIED. It is the decision of this Court that the plaintiff hereby is DENIED all further relief. Judgment will enter accordingly. Rule 58(1), Federal Rules of Civil Procedure.

with NEPA or guidelines. TVA had not then, and has not yet, complied with the law; and that earlier stay and the present stay were granted to enable work on the Duck River project to continue while TVA complies with the law.