ENVIRONMENTAL DEFENSE FUND, INC., Committee for Leaving the Environment of America Natural, Glenn H. Clemmer, G. Randall Grace, and F. Glenn Liming, Plaintiffs,

National Audubon Society, Birmingham Audubon Society, and the Alabama Conservancy, Intervening Plaintiffs,

v.

Clifford R. ALEXANDER, the United States Army Corps of Engineers, and Major General John Morris, Defendants,

Tombigbee River Valley Water Management District, Tennessee–Tombigbee Waterway Development Authority, State of Alabama, and Tombigbee Valley Development Authority, Intervening Defendants.

LOUISVILLE AND NASHVILLE
RAILROAD, Plaintiff,

National Audubon Society, Birmingham Audubon Society, and the Alabama Conservancy, Intervening Plaintiffs,

v.

Clifford R. ALEXANDER, the United States Army Corps of Engineers, and Major General John Morris, Defendants,

Tombigbee River Valley Water Management District, Tennessee–Tombigbee Waterway Development Authority, State of Alabama, and Tombigbee Valley Development Authority, Intervening Defendants.

Nos. EC 77–53, 77–54–K.

United States District Court,
N. D. Mississippi, E. D.

Oct. 1, 1980.

Jon T. Brown, Stephen E. Roady, Washington, D.C., Joseph V. Karaganis, Chicago, Ill., Joseph L. Lenihan, Louisville, Ky., James T. B. Tripp, New York City, William A. Butler, Stewart L. Udall, Washington, D.C., for plaintiff.

Lewis K. Wise, Lawrence Maloney, Edward Christenburg, Glenn Whitaker, Dept. of Justice, Washington, D.C., H. M. Ray, U. S. Atty., Oxford, Miss., Ralph E. Pogue, Aberdeen, Miss., for the District.

Hunter M. Gholson, Columbus, Miss., for the Authority.

William L. Robertson, Jr., Atlanta, Ga., Jane McIntire, Washington, D.C., Alfred P. Holmes, Jr., David H. Webb, Mobile Ala., for the Corps.

William J. Baxley, Atty. Gen., Jerry L. Weidler, William T. Stephens, Asst. Attys. Gen., Montgomery, Ala., for Alabama.

Roger D. Feldman, Washington, D.C., for non–party, A. T. Kearney, Inc.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is another chapter in the saga of the ongoing controversy relating to the Tennessee–Tombigbee Waterway (TTW), a navigation project in Alabama and Mississippi which Congress authorized in 1946 and commenced funding in 1971.

On July 14, 1971, Environmental Defense Fund, Inc. (EDF), Committee for Leaving the Environment of America Natural (CLEAN) and James D. Williams brought a class action on behalf of all persons aggrieved or detrimentally affected by the project against the Secretary of the Army, Chief of Engineers and United States Corps of Engineers to enjoin construction of TTW. The district court on April 13, 1972, dismissed five of the six causes of action alleged in the complaint and ordered an evidentiary hearing on the cause of action based upon noncompliance with the National Environmental Policy Act of 1969 (NEPA). On August 4, 1972, the complaint was dismissed

with prejudice. The district court, while declining to make a substantive review under NEPA, found that defendants had fully complied with NEPA's procedural requirements, *EDF v. Corps of Engineers*, 348 F.Supp. 916 (N.D.Miss.1972). On appeal, the Fifth Circuit affirmed, holding not only that NEPA's procedural requirements had been fully satisfied but also that substantive review by the courts was foreclosed since Congress, which had authorized TTW before NEPA became law and approved and funded its construction after it enacted NEPA, was the ultimate decisionmaker. *EDF v. Corps of Engineers*, 492 F.2d 1123 (5 Cir. 1974). Certiorari was not applied for.

On November 30, 1976, the present action was filed to enjoin the continued construction of the waterway. As before, plaintiffs are EDF, CLEAN and a plaintiff class of individuals aggrieved or detrimentally affected by TTW. Additional plaintiffs are Louisville & Nashville Railroad (L&N), Randall Grace, National Audubon Society, Birmingham Audubon Society and Alabama Conservancy. After extensive discovery, plaintiffs on January 30, 1978, filed an amended complaint which consisted of 15 counts.

In a lengthy evidentiary hearing on the first two counts, the district court held that plaintiffs' primary claim that defendants lacked statutory authorization to construct a channel 300' wide was barred by laches, and that other challenges to modifications of original project design were without merit. *EDF v. Alexander*, 467 F.Supp. 885 (N.D.Miss.1979), *aff'd*, 614 F.2d 474 (5 Cir. 1980), *pet. for cert. filed*, 49 USLW 3031 (Aug. 5, 1980).

Following status conference on May 30, 1980, the court dismissed Count XI upon motion of plaintiffs and scheduled the remaining 12 counts to be considered for disposition on cross–motions for summary judgment and defendants' alternative motion for judgment on the pleadings. The parties have submitted a plethora of exhibits and affidavits as well as voluminous briefs in support of their respective motions.

After due consideration, the court finds that plaintiffs are not entitled to prevail and their amended complaint is dismissed with prejudice, except in one particular as to Count XIV. Instead of treating the counts seriatim, the court has organized discussion of the remaining claims as follows: (1) NEPA issues, (2) benefit/cost computation, (3) local assurances, (4) fish and wildlife, (5) discharge of dredged material, and (6) failure to publish agency regulations.

## I. NEPA ISSUES

In Counts VII, VIII, IX and X, plaintiffs challenge a variety of environmental and economic aspects of the project which they claim violate NEPA, 42 U.S.C. § 4321 et seq. These contentions may be summarized as follows:

(1) illegal segmentation of TTW into two parts, one a waterway between Pickwick Pool in Tennessee and Demopolis, Alabama, and the other a waterway between Demopolis and Mobile, and failure to prepare, circulate and file an Environmental Impact Statement (EIS) discussing the effects on *both* segments before continuing construction;

(2) failure to analyze and disclose project alternatives in the 1976 Economic Reanalysis Summary;

(3) failure to prepare a supplemental or revised EIS after making major changes in project design and subsequently identifying adverse environmental and economic impacts.

Defendants contend that plaintiffs, in attempting to raise charges of NEPA noncompliance, have failed to state claims upon which relief can be granted or that, since there is no genuine issue of material fact, defendants are entitled to summary judgment on all NEPA issues.

Of the many environmental challenges made by plaintiffs, the primary complaint is that the 1976 Economic Reanalysis Summary revealed for the first time that "TTW's

fundamental purpose was to move goods from waters north of Pickwick, Tennessee, through Demopolis, Alabama, and down the river below Demopolis to Mobile," and it was then first disclosed that TTW would require work downstream from Demopolis to achieve maximum navigation benefits. According to plaintiffs, when Corps officials in 1975 discovered that 8–barge tows could not navigate south of Demopolis, they decided to divide the TTW project by treating the 300′ waterway between Pickwick and Demopolis separately from the 200′ waterway between Demopolis and Mobile, and to continue construction on the northern part while studying need for work on the southern part. It is urged that this procedure contravenes NEPA since an EIS on the entire project–Pickwick to Mobile–must be prepared, published and filed before work may continue north of Demopolis. No EIS on the TTW, so plaintiffs contend, has ever discussed and analyzed the impacts of the project upon the river south of Demopolis or upon the Port of Mobile.

In advancing this contention plaintiffs ignore the history of TTW, Black Warrior–Tombigbee River (BWT) and the Port of Mobile as separate congressionally–authorized navigation projects as well as the adjudication that defendants have fully complied with NEPA. This court has previously recounted TTW's history. The salient features are that TTW's original 1939 survey, as contained in House Document 269, reported that the "improvement desired is a navigable waterway of dimensions which would permit modern barge–line operation between the Tennessee and Tombigbee Rivers." [1] House Document 486, which was incorporated in the authorizing statute, Pub.L.No. 79–525, 79th Cong., 2d Sess., enacted July 24, 1946, discussed the "function of the canal and its connections as a through route between the Gulf of Mexico and the Ohio, upper Mississippi, Missouri, and Illinois Rivers." [2] As we have previously found, TTW was designed from its inception as

a navigational project for two–way barge traffic to connect the north–flowing Tennessee River with the south–flowing Tombigbee River so as to provide a continuous waterway from the Tennessee, upper Mississippi and Ohio Valleys to the tidewater Port of Mobile on the Gulf of Mexico. The territorial limits of the TTW, however, extended northward from Demopolis, Alabama, on the existing canalized BWT, a separate navigation project, upstream via the Tombigbee River, East Fork of the Tombigbee, Mackeys Creek, with a deep cut through the divide into Yellow Creek, then to the Pickwick Pool in the Tennessee River near the common boundary of the states of Tennessee, Alabama and Mississippi. The original overall project length—Demopolis to Pickwick Pool, corrected by cutoffs—was 260 miles.

467 F.Supp. at 890.

House Document 486 specifically discussed the relationship of the TTW with the connecting Tennessee River and the 200′ wide Warrior–Tombigbee Waterway, also known as Black Warrior–Tombigbee.[3] Plans for TTW were deferred for a number of years until the project's economics were completely reevaluated in June 1966. The original design of a 170′ channel was then dropped "since that width would unduly restrict tow size and would not be comparable to the connecting channels in the Tennessee and Black Warrior–Tombigbee waterway," [4] and the 1966 study recommended a 300′ wide channel to "enable waterway carriers to operate 8–barge tows in two–way traffic," rather than a 200′ channel for 6–barge tows.[5]

The BWT, south of Demopolis, however, still remained with no more than a 200′ authorized channel width, and limited lock capacity. Both of these factors precluded efficient navigation of 8–barge

1. H.R.Doc.No. 269, ¶ 20 at 16.

2. H.R.Doc.No. 486, ¶ 136 at 51.

3. *Id.,* ¶ 16.

4. *Id.,* ¶ 19.

5. *Id.,* ¶ 21 at 7.

tows on that waterway. In recognition of this, the reevaluation report included in the cost of the TTW project "adding duplicate locks at the Jackson and Demopolis projects when the combined traffic on the Black Warrior–Tombigbee and Tennessee–Tombigbee exceed the capacities of the single locks at those locations." [6]

467 F.Supp. at 894.

The 1966 evaluation report submitted by General Cassidy, then Chief of Engineers, to the Secretary of War, specifically recommended a 300', and not a 200', channel width for TTW. This court has previously found:

> Although it is apparent that both the 1966 reevaluation report and General Cassidy assumed a positive BCR was based upon navigation benefits of 8–barge tows operating between the Tennessee River and Mobile, this assumption did take into account reduced tow speeds, and hence lesser navigation benefits because of existing constraints of the BWT south of Demopolis to 8–barge tows.

467 F.Supp. at 895 n.4.

The 1966 supplement did not anticipate the need for duplicate locks south of Demopolis until the year 2010 when TTW's projected traffic would reach 28 million tons annually.[7] Project capacity, 39 million tons annually, was anticipated by the year 2026.[8] The 1976 report, upon the basis of present studies of prospective commerce on TTW and BWT, found that the duplicate locks would be required at an earlier date after the completion of TTW, then scheduled for 1986, and also the navigation constraints to 8–barge tows would exist in the

BWT at various locations.[9] The report recommended that work continue on TTW and a feasibility report be prepared to investigate more fully downstream navigation work and duplicate locks.

BWT and Mobile Harbor are long–established waterways which Congress traditionally has regarded as entirely separate from TTW, and plaintiffs' fears that TTW's construction will have "coercive" effects upon them are unfounded. The connecting BWT has been a navigation project for which Congress has appropriated funds since 1884.[10] Channel dimensions of 9' × 200' as well as the Oliver Lock were authorized in 1935.[11] First funded by the Rivers and Harbors Act of May 20, 1826, Mobile Harbor has been the subject of many appropriation acts, and present channels were authorized by the Rivers and Harbors Act of September 3, 1954.[12] The increased depth of Theodore Ship Channel, to which plaintiffs allude, was first authorized in 1970,[13] and is a project for which a final EIS was filed in 1977 with the Council on Environmental Quality (CEQ).[14]

It is clear that when the first action was filed attacking the sufficiency of the 1971 EIS and the Corps' failure to comply with NEPA, constraints to 8–barge traffic were known to exist and, if TTW's capacity was to be fully utilized, downstream work on the BWT would be needed. All arguments which plaintiffs now make as to the insufficiency of the original EIS and the need for it to analyze in detail the environmental impacts of TTW on the BWT and Mobile Harbor could have been raised in the original suit. The same can be said of the alleged failure to consider a 200' channel

---

6. *Id.*, ¶ 19 at 6.

7. GDM Supp. Table 4 at 8 and Table A–3 at A–3 & A–4 (1966).

8. *Id.*, Table 4 at 8 and Table B–13 at B–34.

9. Economic Reanalysis Summary at 7–10 (1976).

10. Act of July 5, 1884, Chapter 229, as set forth in H.R.Doc.No. 1491, 62nd Cong., 3d Sess. 395, 405.

11. Act of Aug. 30, 1935, Chapter 831 (Pub. L.No. 74–409), as set forth in H.R.Doc.No. 379, 76th Cong., 1st Sess. 2330, 2336.

12. Pub.L.No. 83–780, as set forth in H.R.Doc. 182, 90th Cong., 1st Sess. 3351, 3355.

13. 1965 Flood Control Act § 201, as modified by § 112 of Water Resources Dev. Act of 1976 (D. Ex. 35).

14. D. Ex. 35 & 36.

rather than a 300′ channel, for these very alternatives were prominently discussed in the 1966 Supplement. As the pleadings, trial transcript and court opinions in the first case clearly reveal, the adequacy of the 1971 EIS was vigorously challenged on numerous grounds, not only for alleged insufficient analysis and treatment of matters which were discussed, but also for many items of environmental and economic concern which the plaintiffs there contended had been completely omitted from the document.[15] Moreover, the alternatives of rail transportation and no action, as well as the project's economic justification, were specifically detailed in the EIS, and unsuccessfully challenged. The Court of Appeals made a final determination on the merits that the Corps officials had complied in all respects with the procedural and substantive requirements of NEPA, 42 U.S.C. § 4321 et seq. 492 F.2d at 1411.

■ All of the present parties who were plaintiffs in the first action–EDF, CLEAN, and the plaintiff class, including Dr. Glenn Clemmer and Dr. F. Glenn Liming–are precluded by res judicata from relitigating any questions of NEPA compliance which could have been raised in the first suit, and this bars them from now complaining that the EIS should have dealt with impacts on the BWT and Mobile Harbor, or more fully considered project alternatives or TTW's economics.

The purpose of the doctrine of res judicata is to promote finality of judgment and judicial economy by eliminating needless relitigation of claims for relief. *Maher v. City of New Orleans*, 516 F.2d 1051, 1055 (5 Cir. 1975), *cert. denied*, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976). A concise statement of the doctrine appears in *Dore v. Kleppe*, 522 F.2d 1369, 1374 (5 Cir. 1975), wherein the court stated that "a final judgment is conclusive on the parties as to all questions of fact and law relevant to the same cause of action which were or could have been litigated in the prior proceeding."

Tests for determining whether the substance of two actions is the same include: Is the same right infringed by the same wrong? Would a different judgment obtained in the second action impair rights under the first judgment? Would the same evidence sustain both judgments?

*Aerojet–General Corp. v. Askew*, 511 F.2d 710, 718 (5 Cir.) (*quoting Astron Industrial Assocs. v. Chrysler Motors Corp.*, 405 F.2d 958, 961–62 (5 Cir. 1968)), *appeal dism'd*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). A judgment in a class action also binds absent members of the class where their interests were adequately represented in the prior suit. *Gonzales v. Cassidy*, 474 F.2d 67, 75 (5 Cir. 1973). Unquestionably, the plaintiff class was capably represented in the prior case, and Drs. Clemmer and Liming are bound by the adverse judgment.

The doctrine of "virtual representation" applies when a party's interest in a suit is "so closely aligned with [a nonparty's interest] as to be his virtual representative." *Pollard v. Cockrell*, 578 F.2d 1002, 1008 (5 Cir. 1978) (*quoting Aerojet–General Corp., supra*, at 719). The purpose of this doctrine is to prevent the beneficial effects of res judicata from being emasculated by merely a formal change of parties. Thus, L&N, Randall Grace and three organizational plaintiffs, having the same interest as the plaintiffs in the prior suit to halt construction of TTW, are brought within the scope of res judicata under this doctrine.

■ Even if res judicata is not effective as to L&N, Randall Grace and three organizational plaintiffs, they are nonetheless subject to the defense of collateral estoppel which prevents them from relitigating issues which were decided on their merits in the earlier case, even though a different cause of action is now presented. *Maher, supra; International Ass'n of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 132 (5 Cir. 1975); *Port Arthur Towing Co. v. Owens–Illinois, Inc.*, 492 F.2d 688, 692 n.6

15. In fact, TTW's effect on Mobile Bay and the charge that the EIS inadequately discussed the impacts upon the Mobile area were a major feature of the prior case. 348 F.Supp. at 939–40.

(5 Cir. 1974). Collateral estoppel applies where (1) the issue to be decided is identical to that involved in the prior action; (2) this issue was actually litigated in the prior action; and (3) the prior determination made on this issue was necessary and essential to the resulting judgment. Moreover, the cause of action in successive litigation is the same where "the primary right and duty, and the delict or wrong are the same in each action." *Wasoff v. American Automobile Ins. Co.*, 451 F.2d 767, 769 (5 Cir. 1971); *see Hall v. Tower Land & Investment Co.*, 512 F.2d 481, 483 (5 Cir. 1975). Indeed, defensive collateral estoppel has been accorded greater acceptance in the courts than when the doctrine has been sought to be used offensively by one who was not a plaintiff in the prior action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979). The NEPA issues actually litigated and resolved in the first suit were of such breadth and scope as to be conclusive on all present contentions which plaintiffs make on the basis of the 1976 economic reanalysis.

■ An alternative ground for our holding is that the 1976 study does not constitute a "recommendation or report on proposals for legislation and other major Federal action significantly affecting the quality of the human environment," so as to require an EIS, under 42 U.S.C. § 4332(C), and to call for public consideration of "alternatives to the proposed action," pursuant to 42 U.S.C. § 4332(C)(iii). The report recommended that the NEPA–approved TTW be continued and "a feasibility report be prepared to more fully investigate the additional navigation works . . . in order that authorization of those works may be considered by the Congress." [16] The language of the report, as to future work, is tentative, preliminary, and of a general nature. Clearly, this is no proposal for legislation as to downstream navigation and lock improvements but only a recommendation to investigate the feasibility of such work. Nor is it a proposal for federal action since the work has not yet been found to be feasible. Though feasible, such work admittedly may not be undertaken without congressional authorization. At most, the report sets forth plans contemplated by Corps officials for additional navigation work and duplicate locks when TTW is completed ten years from the date of the report. The Supreme Court has squarely held that under § 102(2)(C), 42 U.S.C. § 4332(C), the moment at which an agency must have a final statement ready "is the time at which it makes a recommendation or report on a *proposal* for federal action" (emphasis in original text). *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 320, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975); *Kleppe v. Sierra Club*, 427 U.S. 390, 406, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576, 588 (1976). In *Kleppe*, the Court explicitly held that no EIS need be prepared where a project is merely contemplated or studied. In that case, the Department of Interior had conducted studies which contemplated a regional program for coal resources development. The court of appeals erroneously believed that since a regional plan was contemplated, an EIS was necessary for the entire region, and not simply for one section of the region in which agency action was proposed. Reversing, the Supreme Court said:

> The procedural duty imposed upon agencies by this section is quite precise, and the role of the courts in enforcing that duty is similarly precise. A court has no authority to depart from the statutory language and, by a balancing of court–devised factors, determine a point during the germination process of a potential proposal at which an impact statement *should be prepared*. Such an assertion of judicial authority would leave the agencies uncertain as to their procedural duties under NEPA, would invite judicial involvement in the day–to–day decision–making process of the agencies, and would invite litigation. As the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action, it may be assumed that the balanc-

---

**16.** Economic Reanalysis Summary at 40 (1976).

ing process devised by the Court of Appeals also would result in the preparation of a good many unnecessary impact statements. (Emphasis in original text).

427 U.S. 406, 96 S.Ct. at 2728. So here, that Corps officials contemplated that future work should be done does not trigger a NEPA requirement for an EIS encompassing the contemplated work. Despite plaintiffs' contention that a "cumulative or synergistic impact" upon BWT and Port of Mobile will inevitably result from TTW, the Supreme Court, in *Kleppe*, said this sort of claim for a comprehensive EIS is valid only where *several proposals* for action are pending *at the same time* when "their environmental consequences must be considered together." 427 U.S. at 410, 96 S.Ct. at 2730. Footnote 20 of the *Kleppe* opinion emphasizes that the statute (§ 102(2)(C))

speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

427 U.S. at 410 n.20, 96 S.Ct. at 2730 n.20 (emphasis in original text).

The Fifth Circuit applied *Kleppe's* rationale in *Atlanta Coalition v. Atlanta Regional Comm'n*, 599 F.2d 1333 (5 Cir. 1979), to hold that an EIS was not required on Atlanta's long–range transportation plan (RDP) before the implementation of a portion of that plan by widening Interstate 85 from four lanes to as many as sixteen. Relying on *Kleppe*, the court rejected the claim that "coercion" to approve the overall plan caused by the highway widening required an EIS encompassing the entire transportation plan, saying:

Although the *Kleppe* Court accepted in part the thesis that proposed actions with "cumulative or synergistic" effects may require a comprehensive EIS, it added the qualification that an agency need not "consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." *Id.* at 410 n.20, 96 S.Ct. at 2730 n.20. . . . Since it is clear that many, if not most, of the individual transportation projects included in the [Regional Development Plan] are not "proposed" federal actions—some will not ever be implemented, others not for another ten or twenty years—but are, at best, "contemplated" actions, the impact statement prepared on proposed projects . . . need not address the environmental impact of the entire RDP.

599 F.2d at 1349.

In *Texas Committee on Natural Resources v. Bergland*, 573 F.2d 201, 210 (5 Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978), the Fifth Circuit, again applying *Kleppe*, reversed a district court decision which ordered an overall or programmatic EIS on all government–owned East Texas forest lands before allowing a clearcutting project to proceed.

We hold that since neither the BWT improvements mentioned by the Corps in the 1976 report nor the Mobile Harbor improvement alluded to by plaintiffs have reached the proposal stage, there is no requirement that an EIS be prepared to discuss the environmental impacts of such improvements.

Finally, we look at the claim that a supplemental EIS must be prepared because of the subsequent identification of adverse impacts or design changes after the original EIS was judicially approved in 1972. NEPA itself contains no such requirement, but plaintiffs stress that Corps regulations adopted in 1974 do and that they have not been adhered to. The record shows that Corps officials updated the original EIS by compiling and submitting to CEQ 18 volumes entitled First and Second Supplemental Environmental Reports to be appended to the EIS. Summaries of these reports have been received in evidence. (D. Ex. 8, 9). Corps officials claim that this procedure

has satisfied the applicable regulation, 33 CFR § 209.410g.[17] This regulation has three parts. Plaintiffs insist that the first two parts apply, while defendants claim that the third part is controlling. Paragraphs g(1) and (2) provide that a revised EIS shall be prepared whenever (a) there has been a major change in the plan or method of operation of the proposed action, or (b) the EIS on file becomes deficient because certain environmental impacts were not discussed in the EIS or design changes or project purposes were significantly modified after the original statement was filed. Paragraph g(3), upon which defendants rely, provides that whenever it is necessary only to clarify or amplify a point of concern raised after the filing of the final EIS with CEQ or, if comments on the final statement are received from federal, state or local agencies or the public, a clarification, amplification or response shall be prepared and filed with CEQ. Defendants' position is that since no major change has occurred in the project design or purpose, and since the original EIS has not become deficient because of failure to discuss environmental features or because of later significant modifications, it was proper for Corps officials to update the EIS by supplemental reports in the manner provided by ¶ g(3).[18] Additionally, defendants assert that the Corps went beyond the requirements of ¶ g(3) by circulating the supplemental reports to numerous public agencies as well as to University libraries in the project area, and posting public notices as to the availability of the reports. Included in these public materials are such reports as "An Ecological Study of the Tennessee–Tombigbee Waterway" conducted by Mississippi State University, "A Report on the Fishes on the Upper Tombigbee River, Yellow and Indian Creek Systems of Alabama

**17.** g. *Revising or Supplementing Statements* Whenever necessary, an appropriate revision or supplement to a final environmental statement on file with CEQ shall be prepared by the District Engineer. The extent of the revision and further coordination with other agencies, groups and individuals on the project mailing list will be based on paragraph (n) of this section and the following:

(1) If the final environmental statement previously filed clearly failed to comply with the requirements of NEPA: e. g. failed to discuss alternatives or failed to disclose the environmental impacts of the proposed action, or if there has been a major change in the plan of development or method of operation of the proposed action, a revised environmental statement (draft and final) must be prepared and filed with CEQ. The 90 and 30 day waiting period of CEQ guidelines § 1500.11(b) (38 FR 20556) will apply. Revised draft and final environmental statements will be circulated in accordance with paragraph (1)(4) of this section.

(2) Whenever the final environmental statement on file becomes deficient because certain environmental effects of the project were not discussed or design features or project purposes were modified significantly subsequent to the filing of the original environmental statement, an appropriate supplement to the final statement shall be prepared. The supplement will be prepared in draft and final format with a 45 day review and comment period allowed after publication by CEQ in the Federal Register for the draft. . . . The draft supplement will be circulated to agencies, groups and individuals on the project mailing list. Both the draft and final supplement will be filed with CEQ and noted in a separate category in CEQ's weekly listing in the Federal Register.

(3) Whenever it is necessary only to clarify or amplify a point of concern raised after the final environmental statement was filed with CEQ (and such point of concern was considered in making the initial decision) or if comments on the final environmental statement are received from Federal, State or local governmental agencies or the public, the clarification, amplification or response to the comments received shall be prepared and filed with CEQ.

**18.** The prefaces of the First and Second Supplemental Environmental Reports (D. Ex. 5 & 6), state as follows:

The primary purpose of the second phase of the Continuing Environmental Studies is to assure that every opportunity to enhance the environment and to minimize any adverse effects is given full consideration. The ongoing studies of this phase are in greater detail than those conducted in Phase 1 and greatly expand the data base. Analysis of the data is continuing to insure that the environmental aspects are thoroughly integrated into the further planning, design, and construction of the waterway. The results of these continuing studies have not revealed any significant deviations from the EIS as filed and reveal adherence to the points of concern considered in making the initial decision.

and Mississippi" performed by the University of Alabama under the direction of Dr. Herbert Boschung, a bird study directed by Dr. David Rogers of the University of Alabama, various archeological surveys, a study of the macrobenthos in the river section conducted by Teledyne Brown Engineering, studies of the hydrologic environment conducted by the U. S. Geological Survey, an erosion control study for the divide cut conducted by Mississippi State University, and a report on Mackeys Creek release temperatures.

Plaintiffs claim that significant project changes occurring since the 1971 EIS include (a) increase of project land acquisition from 70,000 acres to 105,000 acres; (b) changing from a "perched canal" to the "chain–of–lakes" concept in the canal section; (c) shortening the river section by 20 miles; and (d) taking additional spoil material excavated in the divide cut section.

These claims, both singly and collectively, are without merit. It is clear that major sections of more acreage in the river, canal and divide cut sections will be unaffected by construction, and will not result in destruction of habitat. In other instances, additional lands were acquired to mitigate environmental impact. (D. Ex. 47). Mere increase in the quantity of land for a project does not alone constitute a project change or basis for supplementing the EIS. Plainly, the chain–of–lakes design in the canal section was adopted because of its environmental and aesthetic advantages. Additionally, this court has specifically found that the chain–of–lakes design is not a significant change inasmuch as it does not necessitate acquisition of additional real estate and because the acreage to be inundated by the pools is lowland subject to periodic flooding under the original design. 467 F.Supp. at 910. This court also held that the chain–of–lakes concept "does not affect either the scope or purpose of the project, nor does it materially change the plan of improvement." *Id.*

As for shortening the river section, this court has heretofore found as a fact that the cutoffs were justified from an engineering standpoint since the amount of excavation otherwise required under the Corps new bend–widening criteria would have been much greater, and the additional cutoffs "did not affect the scope, purpose or plan of improvement in any material way." *Id.* Res judicata bars relitigation of plaintiffs' contentions as to the chain–of–lakes concept and shortening of the river.

As for spoil disposal, the excavation of more spoil may hardly be considered as a "design change." In any event, in the original suit, spoil was identified in the EIS as a significant impact

> for the proper disposition of which judicious planning will be required. The EIS further states that "the optimum methods for the disposal of all this material have not been determined;" and various proposals were under consideration for utilization of the excavated material in a most advantageous manner, to enhance the present environment.... The evidence convinces the court that environmental design arts are being employed in the project's advanced engineering stages which will lessen the potential adverse effects of the spoil. Contrary to opinions expressed by some of plaintiffs' witnesses, it will be wholly impracticable to require that the ultimate environmental design for the disposition of this material be included in the EIS.

348 F.Supp. at 938–39. The court finds as a fact that measures respecting spoil disposal as set forth in the supplemental reports to the EIS are essentially those which were visualized by government witnesses in the 1972 trial, and that these disposal measures have proved to be environmentally sound. Additionally, the present reliable estimate of the quantity of all material to be excavated is not more than 6½% of the amount of spoil projected in the 1972 EIS, and this increased amount may hardly be considered a significant new environmental impact.

In *Inman Park Restoration, Inc. v. Urban Mass Transportation Administration*, 414 F.Supp. 99, 118 (N.D.Ga.1976), *aff'd sub nom. Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority*, 576 F.2d

573 (5 Cir. 1978) (per curiam), the court held that the preparation of a revised EIS is an unusual occurrence occasioned "only when there has been a significant change in the *entire project* on which the EIS was prepared *or* when significant new information has arisen which changes the environmental impact of the *entire project*" (emphasis added). Hence, a supplemental EIS is not required merely because clarifying data has become available and there has been no design modification which significantly changes the entire project. Certainly a supplemental EIS on individual components of the TTW is not required under Corps regulations nor under *Save Our Sycamore, supra,* which held that the failure to focus upon and identify components having no independent function did not vitiate an EIS prepared for the entire project. In this case a supplemental EIS discussing impacts of components of TTW having no purpose independent of the waterway is, in our view, neither necessary nor practical.

Plaintiffs also contend that a revised EIS is essential because significant new information has been gained since 1971 as to certain categories of impacts which the original EIS discussed only in general terms. This claim relates to such matters as waterlogging, sedimentation and water quality, disposal or dredged spoil, and fish and wildlife mitigation lands. But these very items were specifically identified as impacts in the original EIS, and can hardly be characterized as significant new impacts under § 209.410g(2). Surely, known impacts upon the environment do not become "new" impacts merely because additional information may have been acquired. To accept plaintiffs' thesis and the supporting affidavits of their experts would strip the 1971 EIS of any validity, and reopen the same factual and legal issues which were resolved in the first suit. We decline to construe the quoted regulation to accomplish such a result.

Moreover, the Corps' final regulation for implementing NEPA, adopted August 25, 1980, and found in 45 Fed.Reg. 56760–56786 is merely declaratory of the previous regulation ER 1105–2–207. With respect to projects in a continuing construction category, the applicable portion of the final regulation, 45 Fed.Reg. 56785, provides that a new EIS is not required in the absence of significant environmental impacts from design changes or new circumstances occurring since the completion of the Phase II GDM. The court finds that the exceptional conditions are not here present.

The court therefore concludes that the Corps officials correctly determined that a revised EIS for TTW did not become necessary or appropriate under its regulations and that they acted properly by filing supplemental reports to the EIS which adequately clarify and amplify all points of environmental concern. The argument that the Corps failed to comply with its own regulation must be rejected. Accordingly, Counts VII, VIII, IX and X are dismissed for failure to state a claim upon which relief can be granted.

## II. BENEFIT/COST COMPUTATIONS

In Counts III and VI plaintiffs attack TTW's economic justification by claiming that defendants have not adhered to statutory and regulatory requirements for computing benefits and costs. Plaintiffs allege various ways in which the project's benefits have been greatly inflated and falsely overstated and costs grossly understated, maintaining that a correct comparison of true benefits and true costs would reveal a benefit/cost ratio (BCR) less than 1, a condition requiring the Corps to deter the project, and they say that defendants have deliberately misrepresented the benefits and costs to the public and Congress. Count III specifically charges defendants have violated the Water Resources Planning Act of 1965, 42 U.S.C. § 1962 et seq., and the regulations promulgated by Water Resources Council entitled *Principles and Standards for Planning Water and Land Related Resources,* 38 Fed.Reg. 24778 (Sept. 10, 1973); and Count VI specifically charges a violation of Flood Control Act of 1944, 33 U.S.C. § 701–1. Plaintiffs also rely upon § 7(a) of the Department of Transportation Act of 1966, 49

U.S.C. § 1656(a), and Corps regulation ER 1120–2–114. The common theme of these statutes and regulations is that the benefits of a water resource project should exceed the costs.

Defendants interpose several defenses to these issues of economic justification: first, that plaintiffs lost on such claims in the former litigation and are barred from relitigating them by invoking different statutes than those previously relied upon; second, that benefit/cost computations are agency decisions which, apart from NEPA, are not subject to judicial review; and third, that Congress has affirmed the benefit/cost computations submitted by Corps officials by making annual appropriations to TTW and courts may not review congressional decisions of this character. We find merit in these positions.

Certain basic facts are undisputed. On March 30, 1967, Congress was advised that TTW, based on a 50–year project life, had an estimated BCR of 1.24 and, in the opinion of then Secretary of Army Resor, the proposed investment (then estimated at $316 million) was "only marginally justified." 348 F.Supp. at 924 n.10. In July 1970, the project's BCR was established at 1.6, based on estimated federal costs of $323,000,000 and annual benefits of $31,-772,000. The project's benefits were chiefly navigation, but recreation, fish and wildlife and area redevelopment were also calculated as benefits. Matters stood in this posture when the first suit was filed in 1971.

By February 1975, the Corps ascertained that the BCR had fallen to 1.4, and the project's cost had risen to $815,000,000. Corps officials realized that inflation and other factors of increased costs threatened to drive the BCR below 1. In March 1975 the Corps advised Congress:

Current estimates [of benefits] are based on field traffic survey data collected in 1964 and reflects [sic] base year conditions as of 1963. Due to the recent rapid escalation of transportation and construc-

tion costs and the lengthy period since the 1963 field survey, an economic reanalysis based on new field traffic surveys, current freight rate analyses and updated construction costs has been initiated. The results of this analysis will be available in January 1976.[19]

Thereafter, Corps officials engaged A. T. Kearney & Company, management consultants, to make an extensive study of the transportation economics of TTW.

The results of the Kearney investigation and other data were incorporated in the 1976 Economic Reanalysis Summary. As previously noted, this study dealt with three areas of evaluation: (a) the basic project plan, or the authorized TTW which extended from Demopolis Lake to Pickwick Reservoir; (b) navigation work on the BWT downriver from Demopolis; and (c) duplicate lock construction at Demopolis and Coffeeville. While noting that plans (b) and (c) were not authorized, the report stated that, despite the identified constraints, TTW was "economically justifiable, but in view of the current projections of traffic the plan [authorized TTW] would neither provide for the orderly development of Waterway capacity nor for the optimization of project benefits." The report estimated that the authorized project still had a positive BCR, at 1.08, with annual benefits of $88,896,000 and annual charges of $82,339,-000. At October 1975 price levels, TTW's total cost was calculated at $1,360,400,000. Twenty–eight million tons of commerce, principally coal and metallic ore shipments, were estimated for the initial year of completion, 1986, to derive transportation savings of $55.5 million. The report also brought out that the carrying capacity of the 300′ TTW would be constrained by the 200′ BWT downriver from Demopolis by necessitating the use of 6–barge, and not 8–barge, tows on that portion of the river and by the need for duplicate locks. If both hindrances were overcome, the BCR would rise to 1.30.

**19.** Corps of Engineers Justification Data, Congressional Submission, Fiscal Year 1976, etc. at 49.

Plaintiffs assail the accuracy of the 1976 economic reanalysis and say that, to arrive at 28 million tons of traffic moving over the TTW in 1986, the Corps has had to assume that the BWT south of Demopolis can accommodate two–way 8–barge traffic and has ignored the admitted constraints. According to plaintiffs, the 200' BWT can safely accommodate two–way traffic of no more than 4–barge tows. Plaintiffs also vigorously challenge the methodology of the Kearney transportation survey, claiming that it is based upon numerous false assumptions, incorrect and nonexistent data and completely fails to comply with traffic formulas mandated by statute as well as by the Corps' own regulations.

Plaintiffs present the affidavits of Dr. Joseph L. Carroll and Dr. Robert Haveman, economic experts, and other specialists which provide substantial factual support for their contentions. Defendants offer counteraffidavits of experts who furnish contrary opinions. Thus, genuine issues of material fact are raised which preclude the court from granting summary judgment if issues relating to benefit/cost computations are judicially reviewable.

▮ We continue to be of the opinion that benefit/cost computations insofar as TTW is concerned are not judicially reviewable. In the first place, plaintiffs are prevented from relitigating these issues. Plaintiffs in the first suit contended that "the navigation benefits were substantially overstated by the Corps," 348 F.Supp. at 924, and invoked 33 U.S.C. § 701a as a statutory violation. The district court ruled that calculation of BCR was not subject to judicial review. On appeal the Fifth Circuit held that "whatever rights may exist under that statute [33 U.S.C. § 701a] have been subsumed by NEPA insofar as our review of the Tennessee–Tombigbee project is concerned." 492 F.2d at 1134. It is to be noted that different statutes now relied upon by plaintiffs were enacted prior to 1971, were directly related to the economic issues raised in the first complaint, and could and should have been raised at that time. Plaintiffs cannot escape the bind of res judicata. Plaintiffs state that res judicata should not apply for two reasons. The first reason–that alleged miscalculation of the BCR in the 1976 reanalysis had not taken place before 1971 and therefore could not have been litigated–merits scant attention. The issue litigated in the prior suit, which is the same as the issue plaintiffs would litigate here, is whether or not BCR calculations are agency action that is reviewable by a court of law. That the Corps made a particular BCR calculation after 1971 is immaterial to the prior conclusion that such calculations are not subject to judicial review.

Plaintiffs' second ground for not applying res judicata is that several parties plaintiff in the case sub judice were not before the court in the earlier suit and that therefore they cannot be bound by that suit. As previously noted, if the "new" plaintiffs are not bound by res judicata under the virtual representation doctrine, they are surely precluded by collateral estoppel from relitigating identical issues. We therefore sustain defendants' pleas of res judicata and collateral estoppel and conclude that we are barred from reconsidering the issue whether BCR calculations are judicially reviewable under the cited statutes.

▮ Apart from res judicata, most courts have ruled there is no independent right of judicial review of statutes providing for benefit/cost computations by agencies for congressional review and action on public works projects. *See, e. g., Sierra Club v. Froehlke*, 392 F.Supp. 130, 141 (E.D. Mo.1975), *aff'd*, 534 F.2d 1289 (8 Cir. 1976); *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404, 413 (W.D.Va.1973), *aff'd*, 484 F.2d 453 (4 Cir. 1973) (per curiam); *EDF v. Corps of Engineers*, 325 F.Supp. 728, 740 (E.D.Ark. 1970), *aff'd*, 470 F.2d 289 (8 Cir. 1972); *Sierra Club v. Froehlke*, 345 F.Supp. 440, 446–47 (W.D.Wisc.1972), *aff'd*, 486 F.2d 946 (7 Cir. 1973); *Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29, 35 & n.11 (3 Cir. 1976); *United States v. West Virginia Power Co.*, 122 F.2d 733, 738 (4 Cir.), *cert. denied*, 314 U.S. 683, 62 S.Ct. 187, 86 L.Ed. 547 (1941); *EDF v. Froehlke*, 473 F.2d 346,

356 (8 Cir. 1972); *Atchison, Topeka and Sante Fe Railway Co. v. Callaway,* 480 F.Supp. 972, 977 (D.D.C.1979). Although these decisions have been concerned with 33 U.S.C. § 701a, as in the past TTW suit, their rationale applies with equal force to the statutes mentioned by plaintiffs in Counts III and VI, since it is apparent that they were intended to furnish Congress data to enable it to reach legislative decisions for authorizing funding of particular water resource projects. 33 U.S.C. § 701–1, enacted in 1944, was to "continue the natural flood–control policy and program initiated by the Act of 1936 [33 U.S.C. § 701a]."[20] The statute reaffirmed congressional policy on flood control projects by declaring that navigation projects should not be authorized or constructed unless there is "substantial benefit to navigation." Similarly, the Water Resources Planning Act, 42 U.S.C. § 1962 et seq., passed in 1962, and the guidelines promulgated by the Water Resources Council, first appearing in 1962 as "Senate Document 97" and reissued in 1973, 38 Fed.Reg. 24778 (Sept. 10, 1973), had as their primary goal the furnishing of information to the President and Congress in connection with their planning efforts in the water resources field. *Atchison, supra,* at 978. *See also* H.R.Rep.No. 169, 89th Cong., 1st Sess.[21] Neither do we believe that § 7(a) of the Department of Transportation Act of 1966, 49 U.S.C. § 1656(a) and the Corps Regulation ER 1120–2–114 permit judicial review. 49 U.S.C. § 1656(a) simply creates authority in the Water Resources Council to set up "standards for the economic evaluation of water resource projects and also requires the *Council* to adhere to a statutory definition of the 'primary direct navigation benefits' of such a project." *Atchison, supra,* at 979 (emphasis added).

These statutes and regulations serve the same purpose as 33 U.S.C. § 701a, *i. e.,* to govern calculation of BCRs for the informa-

tion of Congress. Perhaps the most succinct statement of nonreviewability of such statutes, apart from NEPA, may be found in *EDF v. Corps of Engineers,* 325 F.Supp. 728, 740 (E.D.Ark.1971):

> It is for the Congress to determine, in authorizing such a project and in, thereafter, making subsequent appropriations therefor, whether the benefits are "in excess of the estimated costs." The Court does not believe that it has the authority to enjoin the expenditure of appropriated funds upon a showing that the benefits are less than the estimated cost. The plaintiffs and others are free to bring such matters to the attention of the legislative branch at the time any new appropriation for this project is proposed. Indeed, they could bring the matter to the attention of Congress at this time with the hope of obtaining legislation which would prevent the expenditure of funds *already* appropriated (which would obviously include those needed for the construction of the dam proper and the clearing of the lake). The methods of calculating cost–benefit ratios are innumerable and in many cases esoteric. The Court's judgment as to sound procedures in this regard might well not be in accord with the judgment of Congress. And, as stated above, the Court does not believe it should, in any event, attempt to substitute its judgment for that of the legislature. (emphasis in original text).

The same result may be found in *Duck River Preservation Ass'n v. TVA,* 410 F.Supp. 758, 766 (E.D.Tenn.1974). In *Duck River* the court rejected the argument "that TVA was required to recompute continually the benefit–cost ratio of the project" because *inter alia* the matter was legislative and "not subject to judicial review." *Id.*

A case relied upon by both sides is *Atchison, supra,* which construes the statutes at issue here. In *Atchison* the district court

---

**20.** H.R.Rep.No. 1309, 78th Cong., 2d Sess., *reprinted in* [1944] U.S.Code Cong. & Admin. News 1349, 1353.

**21.** The 1973 "Principles and Standards for Planning Water and Land Related Resources"

were promulgated two years after construction was commenced on TTW, and, by their terms, apply only to projects in planning stages, and not to those specifically authorized by Congress. *See* 33 CFR § 263.14(a).

denied review of BCRs in the absence of NEPA [22] because "Congress intended those laws to serve a more limited purpose than NEPA." *Id.* at 977. Thus, "[t]he judiciary should defer to congressional expertise in the weighing of costs and benefits, except where Congress has indicated that judicial scrutiny is appropriate." *Id.* Finding a lack of such indication in congressional silence, the court declined to review agency action, reasoning as follows:

[These statutes' and regulations'] primary goal is to provide the President and Congress with guidance in their planning efforts in the water resources field. See H.R.Rep.No.169, 89th Cong., 1st Sess. 3 & 5 (1965), U.S.Code Cong. & Admin.News 1965, p. 1921. Because these guidelines are intended for the primary benefit of Congress and the President, approval of a recommended project by these lawmakers vitiates whatever claims a party may possess regarding the Corps of Engineers compliance with the Act and regulations thereunder. In this case, Congress has itself weighed the costs and benefits and, by authorizing construction, indicated its finding that the benefits exceeded costs, within the meaning of the Water Resources Planning Act. Once Congress has reached a decision on this matter, courts should decline to interfere with the legislative judgment. *Cf. Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 527–528, 61 S.Ct. 1050, 1060, 85 L.Ed. 1487 (1941). In contrast to NEPA, Congress did not envision continuing judicial review to determine compliance with the Act. . . . All of the defects could have

been—or were in fact—brought to the attention of Congress during the legislative process; yet, Congress decided to accept the proposal despite the alleged non–compliance with [these provisions]. The Court believes that congressional approval . . . is tantamount to a finding that these oversights either never occurred or were, for the purposes of [these provisions], insignificant. It would certainly constitute an invasion of the legislative process for this Court to breathe new life into these allegations and then seek to determine their accuracy. *Id.* at 978.

Finally, as held by the Fifth Circuit, Congress is the "ultimate decisionmaker" of the TTW. That court has explicitly held that although BCRs were reviewable through NEPA, even that review was foreclosed because Congress had determined that the waterway should be built. It must be emphasized that it is the Congress–not the Corps of Engineers–which has to this date [22a] continued massive funding of the project.

The record discloses that, just as in *Atchison, supra*, at 978 n.1, plaintiffs have presented to Congress allegations that the Corps has furnished Congress with false and misleading information about the waterway's benefits and costs. Congress, at least since 1975, has considered not only data submitted by the Corps but also information supplied by plaintiffs, including the allegations of misrepresentation made here.[23] The Corps itself reported to Con-

**22.** On the subsumation of § 701a into NEPA, we are bound by *EDF v. Corps of Engineers*, 492 F.2d 1123 (5 Cir. 1974).

**22a.** We note that, since the date of this decision but prior to publication, the Fifth Circuit has reiterated that a decision by Congress to approve funding of a project despite known economic and environmental problems "effectively supplants the Corps' decision to build the project, and precludes [court] review of that substantive decision." South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005, 1013 (5 Cir. 1980).

**23.** Public Works for Water and Power Development and Atomic Energy Commission Appro-

priation Bill, 1975: Hearings before the Subcommittee on Public Works of the Committee on Appropriations, House of Representatives, 93rd Cong., 2d Sess., Part 1 at pages 509, 512, 640; Part 7 at pages 248, 252, 253, 258, 265.

Public Works for Water and Power Development and Energy Research Appropriation Bill, 1976: Hearings before the Subcommittee on Public Works of the Committee on Appropriations, House of Representatives, 94th Cong., 1st Sess., Part 1 at pages 480, 486.

Public Works for Water and Power Development and Energy Research Appropriation Bill, 1977: Hearings before the Subcommittee on Public Works of the Committee on Appropriations, House of Representatives, 94th Cong., 2d

gress the substance of plaintiffs' allegations on justification sheets for the fiscal years 1979–1981. Notwithstanding plaintiffs' allegations, Congress has not discontinued its support for the project. *See EDF v. Alexander*, 467 F.Supp. at 898 n.6. Of course, Congress is free to, and often does, make legislative decisions on factors outside the scope of judicial review; and it may, for whatever reason it sees fit, fund a water resources project which lacks a positive BCR.[24]

Plaintiffs argue that *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), has dismantled the notion that Congress is "the ultimate decisionmaker" merely by passing appropriation acts. *Hill* is readily distinguishable. The Court, in *Hill*, refused to regard congressional appropriations for the Tellico Dam as a repeal of the Endangered Species Act as it affected Tellico Dam. There "an irreconcilable conflict" was found to exist between the explicit provisions of a substantive statute and a project which Congress had funded. "The plain intent of Congress in enacting this statute [Endangered Species Act] was to halt and reverse the trend toward species extinction, whatever the cost." 437 U.S. at

Sess., Part 1 at pages 622, 628, 643, 644; Part 8 at pages 970–973, 976, 978.

Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978: Hearings before the Subcommittee on Public Works of the Committee on Appropriations, House of Representatives, 95th Cong., 1st Sess., Part 1 at pages 723, 730; Part 8 at pages 1532, 1533, 1538; Part 9 at pages 37, 104, 110.

Public Works for Water and Power Development and Energy Research Appropriation Bill, 1979: Hearings before the Subcommittee on Public Works of the Committee on Appropriations, House of Representatives, 95th Cong., 2d Sess., Part 2 at pages 1579, 1587; Part 8 at pages 29, 34, 42, 55, 73, 82, 90.

Energy and Water Development Appropriations for 1980: Hearings before the Subcommittee on Energy and Water Development of the Committee on Appropriations, House of Representatives, 96th Cong., 1st Sess., Part 2 at pages 801, 810; Part 9 at page 2141.

Energy and Water Development Appropriations for 1981: Hearings before the Subcommittee on Energy and Water Development of the Committee on Appropriations, House of Representatives, 96th Cong., 2d Sess., Part 3 at pages 2949, 2958, 3113, 3114, 3330; Part 9 at pages 42, 820, 822, 823, 825, 827, 830, 840.

Public Works for Water and Power Development and Atomic Energy and Atomic Energy Commission Appropriations for Fiscal Year 1975: Hearings before the Subcommittee of the Committee on Appropriations, United States Senate, 93rd Cong., 2d Sess., on H.R. 15155, Part 1 at page 307; Part 6 at pages 4694, 4707.

Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1976: Hearings before a Subcommittee of the Committee on Appropriations, United States Senate, 94th Cong., 1st Sess., on H.R. 8122, Part 1 at pages 317, 323; Part 6 at page 5540; Part 7 at pages 6915, 6917.

Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1977: Hearings before a Subcom-

mittee of the Committee on Appropriations, United States Senate, 94th Cong., 2d Sess., Part 1 at pages 45, 51, 172; Part 7 at pages 6576, 6381, 6383, 6387.

Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1978: Hearings before a Subcommittee of the Committee on Appropriations, United States Senate, 95th Cong., 1st Sess., on H.R. 7553, Part 2 at pages 1310, 1317; Part 7 at pages 2296, 2299, 2300.

Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1979: Hearings before a Subcommittee of the Committee on Appropriations, United States Senate, 95th Cong., 2d Sess., on H.R. 12928, Part 2 at pages 1697, 1705; Part 6 at pages 234, 235, 249, 251, 252.

Energy and Water Development Appropriations for Fiscal Years 1980: Hearings before a Subcommittee of the Committee on Appropriations, 96th Cong., 1st Sess., Part 2 at pages 2076, 2085, 2241; Part 8 at pages 1390, 1391, 1394, 1397, 1414, 1415.

122 Cong.Rec. 5889, 5890 (1976)

124 Cong.Rec. S17028–S17030 (daily ed. Oct. 4, 1978)

125 Cong.Rec. S3471–S3477 (daily ed. Mar. 27, 1979)

126 Cong.Rec. H318–H322 (daily ed. Jan. 29, 1980)

**24.** Such an example is the Montgomery to Gadsden, Coosa River Channel, Alabama project, which was authorized in the 1945 Rivers and Harbors Act, Pub.L. 79–14, as amended by Pub.L. 83–436. Testimony presented on June 28, 1978, showed this project to have BCRs of 0.50 using a $3\frac{1}{4}\%$ interest rate and 0.30 using a $6\frac{5}{8}\%$ interest rate. *See* Subcommittee on Public Works, Committee on Appropriations, United States Senate, F Y 79 hearing transcript, Part 9, pages 364, 365. Notwithstanding the negative BCRs, Congress appropriated $1,400,000 for the project. Pub.L. 95–482; 60 Stat. 634.

184, 98 S.Ct. at 2297. No such conflict here exists, for the legislative enactments relied upon by plaintiffs, *i. e.*, the Water Resources Planning Act of 1965, the Department of Transportation Act of 1966, and the Flood Control Act of 1944, and regulations associated with those statutes, are not mandatory upon Congress but were enacted for the express purpose of furnishing data to enable Congress to exercise its own judgment in the funding of particular water resources projects.

For the foregoing reasons, plaintiffs have failed to state claims in Counts III and VI upon which relief can be granted, and those counts must be dismissed with prejudice.

### III. LOCAL ASSURANCES

#### (a) *Discount Rate.*

In Count IV plaintiffs allege that the defendants are violating § 80 of the Water Resources Development Act of 1974, 42 U.S.C. § 1962d–17(a), by using a 3¼% interest rate in effect prior to December 24, 1968, rather than the current interest rate (now 7⅛%) to compute benefits and costs. Plaintiffs urge that the current interest rate is mandated by Congress and utilization of it would so greatly reduce benefits and greatly increase costs that costs would far exceed benefits, thus requiring the project to be placed in the inactive category under Corps regulations.

By § 80(a) of the Water Resources Development Act, 42 U.S.C. § 1962d–17(a), the interest rate formula for waterway projects is determined by the Water Resources Council and the latest published rate is 7⅛%. 18 CFR § 704.39. Section 80(b)[25] of the Act contains a "grandfather clause," which provides that an alternate interest rate may be used if two conditions have been met: (1) the project must have been authorized before January 3, 1969; and (2) the appropriate non–Federal interest, prior to December 31, 1969, must have given "satisfactory assurances to pay the required non–Federal share of project costs." If both conditions are satisfied, "the discount rate to be used in the computation of benefits and costs . . . shall be the rate in effect immediately prior to December 24, 1968, and that rate shall continue to be used for such project until construction has been completed, unless otherwise provided by a statute enacted after March 7, 1974." TTW was, of course, authorized long before January 3, 1969. It is undisputed that a discount rate of 3¼% was in effect immediately prior to December 24, 1968 and no statute has been enacted since March 7, 1974, which would alter the requirements of § 80(b). The question remaining is whether the non–Federal interests envisioned by Pub.L.No. 79–525 (Alabama and Mississippi or their statutory agencies) did, prior to December 31, 1969, give "satisfactory assurances to pay the required non–Federal share of project costs." These local costs consist of alterations in highways, highway bridges, sewer, utilities, etc.

Both sides seek summary judgment on this claim, and defendants also move for judgment on the pleadings. Plaintiffs urge that neither Alabama's nor Mississippi's assurances prior to December 31, 1969, or indeed since that date, are in fact satisfactory, that the assurances which have been given fail to satisfy Corps criteria, and that, since there is no reasonable prospect that the required local contributions will be forthcoming, the Corps has been under a duty since 1974 to place TTW in deferred status. Federal defendants mount several defenses: first, the plaintiffs have no standing to challenge a violation of § 80 of the Water Resources Development Act of 1974; second, that the determination of adequacy of local assurances of support for TTW, being solely a matter of agency discretion with no law or standards for a court

---

**25.** (b) In the case of any project authorized before January 3, 1969, if the appropriate non–Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non–Federal share of project costs, the discount rate to be used in the computation of benefits and costs for such project shall be the rate in effect immediately prior to December 24, 1968, and that rate shall continue to be used for such project until construction has been completed, unless otherwise provided by a statute enacted after March 7, 1974.

to apply, is not susceptible to review under the Administrative Procedure Act; third, that plaintiffs' challenge to the 3¼% interest rate is barred by principles of res judicata, collateral estoppel and laches; fourth, that, if the merits of the claim are reached, plaintiffs cannot show the agency's determination as to sufficiency of local contribution to be arbitrary and capricious; and finally, that even if a higher interest rate should be applied in computing the benefits and costs of TTW, the remedy is not to grant plaintiffs an injunction but to require that Corps officials submit a revised benefit/cost analysis to Congress on the basis of the new rate.[26]

We first address the issue of standing since it poses a serious question whether plaintiffs may complain about a violation of § 80(b). To have standing plaintiffs must (1) allege and establish some injury–in–fact, and (2) show the interest they seek to represent is "arguably" within the zone of interests protected by the statute. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Data Processing Serv. Org'ns v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Section 80(b) does not expressly grant a private right of action. To be reviewable under the Administrative Procedure Act, 5 U.S.C. § 701, plaintiffs must show they suffer a legal wrong or are adversely affected by the agency action. Insofar as plaintiffs represent environmental interests, they are unable to show that any injury–in–fact would result from the failure of local contribution in altering highways, bridges, and utilities. Plaintiffs' environmental interests are alleged to be harmed by the construction of TTW, and not by relocating public highways, bridges, and utilities, which would be affected by the waterway project. As defendants aptly observe, the environmental interests which plaintiffs seek to advance would be aided, at least not hindered, by the *absence* of local contribution.

Two cases support the view that environmental plaintiffs have no § 80 standing. In *Sierra Club v. Froehlke*, 486 F.2d 946 (7 Cir. 1973), the court held environmental plaintiffs lack standing to assert that the Secretary of the Army failed to obtain local assurances of cooperation under § 201 of the Flood Control Act of 1962. That statute, which authorized the building of a flood control dam on Kickapoo River, contained a stipulation that the authorization would expire within five years unless the local interests (two downstream communities which were obligated to pay the cost of certain flood protection levees) gave "assurances satisfactory to the Secretary of the Army that the required cooperation will be furnished." The court noted that the interests of the plaintiffs were two–fold: that some plaintiffs canoed on a portion of the river which would be inundated if the project was completed and that other plaintiffs owned land which would be condemned if the project continued. On this showing it was ruled that plaintiffs' claim of injury was "the continuation and completion of the project ... and not the per se failure of the Corps to obtain local assurances as required by statute." *Id.* at 954. Additionally, the plaintiffs' interests were held to be outside the "zone of interest" test for the statute under review since the plaintiffs' interest related only to the construction of the dam and not to the downstream levees. The Seventh Circuit found that the plaintiffs there were unable to show an economic injury attributable to the construction of the local protection levees "with or without the required local assurances." *Id.* The court also emphasized that although plaintiffs had standing to raise the NEPA claims, that did not "obviate any standing requirement for their

---

**26.** The issue may well be moot. An affidavit of recent date submitted by the Governor of Alabama states that all relocations and other local work required of his state have either been completed or are under construction, with more than adequate funding to meet all requirements of his state. Mississippi officials submit similar affidavits stating that all Mississippi responsibilities have been met by work either under construction or contracted for. The single exception is reconstructing a U.S. Highway 78 bridge, for which necessary funds are said to be available.

'local assurances' claim under § 201 of the Flood Control Act of 1962." *Id.*

*Akers v. Resor,* 339 F.Supp. 1375 (W.D. Tenn.1972), *injunction cont'd,* 443 F.Supp. 1355 (W.D.Tenn.1978), held that plaintiffs who represented environmental interests had no standing to complain that assurances of support by the State of Tennessee were insufficient to permit the enlargement of a canal under 33 U.S.C. § 701c. That statute provided that no money for the waterway project shall be expended until the states or other responsible local agencies "have given assurances satisfactory to the Secretary of the Army" to provide, *inter alia,* all lands, easements and rights–of–way necessary for the construction of the project. District Judge Bailey Brown found that the plaintiffs

> do not have standing to complain about a failure to comply with the aforesaid statutory provision. The interest that the plaintiffs seek to protect is that of ecology; and since such interest is not arguably within the zone of interest intended to be protected by this statutory provision, they do not have standing.

*Id.* at 1378 (citing *Data Processing, supra*).

Plaintiffs cite two cases which recognize § 80 standing. *Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29 (3 Cir. 1976), and *State of Alabama ex rel. Baxley v. Corps of Engineers,* 411 F.Supp. 1261 (N.D.Ala.1976). In *Grant,* the construction of a flood control dam was authorized by the Watershed Protection and Flood Prevention Act of 1954, 16 USC § 1001, et seq. The plaintiffs were owners of property situated in the area immediately surrounding the proposed dam and alleged that construction of the dam would diminish the value of their property and impair their enjoyment of the area's recreation and aesthetic resources. The court found these interests to be sufficient to satisfy the requirement of injury–in–fact. 537 F.2d at 33. The court also found that the interests asserted by plaintiffs were arguably within the zone of interest sought to be protected by the statute since § 1 of the Act, 16 U.S.C. § 1001, identified one of the purposes of the statute to be the goal of "preserving, protecting, and improving the Nation's land and water resources and the quality of the environment." *Id.* Neither of these conditions is present here.

In *Baxley,* the district court held that the State of Alabama, in an action brought by the state attorney general, had standing to sue under § 80. 411 F.Supp. at 1266. That case is readily distinguishable since it did not involve a right of action brought by a private party.

Plaintiffs also urge that, quite apart from environmental concerns, Louisville and Nashville Railroad (L&N) has § 80 standing because it will sustain economic injury upon the completion of the waterway. In this respect, plaintiffs allege that substantial shipments of coal and other commodities will be diverted from rail to water transportation when TTW becomes operational, and that, unlike L&N, which has had to purchase and maintain its rights–of–way and pay taxes thereon, barge operators will use the waterway free of such costs, thus placing L&N "at a decided competitive disadvantage in the economic competition for coal and other commodities now moving over plaintiff's rail lines." Amended Complaint, App. ¶¶ 2, 3. Based on these allegations, it is contended that the railroad will sustain economic injury if the federal defendants are allowed to construct a waterway which cannot be economically justified.

 It is well–settled law that, to make a case or controversy, cognizable in the federal courts, the injury alleged by a party must be concrete, not abstract; it must be objective, not speculative; and the threat of injury must be both real and immediate, not conjectural or hypothetical. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674, 682 (1974). The Supreme Court has consistently denied standing to plaintiffs who have relied on "little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." *Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct.

2197, 2209, 45 L.Ed.2d 343, 360 (1975); *Simon v. Eastern Ky. Welfare Rights Org'n*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450, 464 (1976). We conclude that L&N, having shown a substantial likelihood of economic harm by having to compete with subsidized water transportation, has standing to raise this issue.

However, we further conclude that plaintiffs' claim under 42 U.S.C. § 1962d–17 must be dismissed because the determination by the Secretary of the Army that the assurances of local support are satisfactory is wholly discretionary with the Secretary and not subject to judicial review. It is, of course, familiar law that the actions of federal agencies, including the Department of the Army, are reviewable under § 701 of the Administrative Procedure Act, 5 U.S.C. § 701, "except to the extent that ... (2) agency action is committed to agency discretion by law," and that courts recognize few exceptions to reviewability. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136, 150 (1971); *Sierra Club v. Bergland*, 451 F.Supp. 120, 123 (N.D.Miss.1978).

House Document No. 486, which was incorporated into TTW's authorizing statute, Pub.L.No. 79–525, provides as follows:

> The Board therefore recommends that the United States undertake the construction of a waterway ... subject to the condition that local interests give *assurances satisfactory to the Secretary of War* * *that they will:*

> \* By § 205(a) of Act, July 26, 1947, chap. 343, Title II, 61 Stat. 501, the Department of War was designated the Department of the Army and the title of the Secretary of War was changed to Secretary of the Army.

> (a) Make and maintain at their expense alterations as required in highways and highway bridges and in sewer, water supply, and drainage facilities.

> (b) Provide and maintain at their expense as required suitable and adequate river and canal terminals in accordance with plans approved by the Secretary of War and the Chief of

Engineers. (House Document No. 486, p. 55–56). (Emphasis added).

By its plain terms, the statute confers upon a designated public official–the Secretary of the Army–the sole responsibility and discretion for determining the satisfactoriness or sufficiency of the local assurances, and the discretion thus delegated to him by Congress is not reviewable in the courts. Manifestly, no standards are articulated in the authorizing statute or the underlying House Document for determining the sufficiency of the required local assurances. Consequently, the language is "drawn in such broad terms that ... there is no law to apply." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 410, 91 S.Ct. at 821. In *Akers v. Resor, supra*, the district court held that in a statute expressly providing "assurances satisfactory to the Secretary of the Army," for the commencement of a waterway project, the statute committed the decision of local assurances to agency discretion and therefore there was no "law to apply." 339 F.Supp. at 1378. The Seventh Circuit in *Porter County Chapter of Izaak Walton League v. Costle*, 571 F.2d 359, 367 (7 Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1978), held that Pub.L.No. 89–298, a statute authorizing the development of Burns Waterway Harbor, required that the State of Indiana furnish "assurances satisfactory to the Secretary of the Army" that water and air pollution sources be controlled to the maximum extent feasible. The court noted that

> the public law does not articulate any specific standard. The Act voices only a broadly stated objective, which gives the Secretary of the Army authority to exercise his discretion in obtaining assurances from Indiana of "maximum feasible" pollution control in Burns Harbor.... We think the Secretary's acceptance of Indiana's submission is the end of the matter as regards the applicability of Public Law 89–298.

Plaintiffs again rely upon *Baxley*, a case relating to a Corps project for channeliza-

tion of Luxapalila Creek, a tributary of the Tombigbee River, carried out under the Flood Control Act of 1958, Pub.L.No. 85–500. Local interests were required to obtain necessary easements and relocate roads and bridges. District Judge Hancock, in *Baxley*, found the phrase "satisfactory assurances" in § 80(b) was used "in a general nonspecific sense and vests no particular public official with the authority to make a determination of precisely what degree of assurances is required in order to be considered 'satisfactory.'" 411 F.Supp. at 1272. Judge Hancock was not called upon to construe TTW's authorizing statute, which specifically provided that *local interests give assurances satisfactory to the Secretary of the Army.* Rather, *Baxley* pointed out that § 80(b) did not contain statutory language "so definitive or restrictive," and the phrase "satisfactory assurances" was "to be tested by an objective standard rather than a subjective standard of a particular public official." *Id.* To apply *Baxley's* rule of construction here would require the court to delete the critical words "local interests give assurances satisfactory to the Secretary of the Army" in TTW's authorizing statute and rearrange the phrase to read "local interests give satisfactory assurances." Since we find nothing in the Water Resources Development Act of 1974, or its legislative history, indicating an intent to modify or amend Pub.L.No. 79–525, the provisions of the latter statute remain in force as first adopted.

Moreover, the record shows beyond dispute that the Secretary of the Army has found that satisfactory assurances of the non–Federal costs have been given. These assurances have been annually documented by his delegate, the Chief of Engineers, in justification data submitted to Congress. (D.Ex. 38, 39, offered at the Authorization Hearing). Each year since the start of the

project there has been a detailed statement made as to the nature and extent of the local contributions. This procedure began in 1970, when the estimated non–Federal cost was $38,100,000 and has continued through 1980 when such cost has climbed to $137,000,000. In no instance has the Secretary of the Army noted on the cost justification sheets dissatisfaction with the stated local support, nor has he ever taken exception to the sufficiency of those assurances. The court can find no reason not to take this documentation at face value and concludes that the Secretary of the Army has in fact accepted as satisfactory to him local assurances for providing non–Federal costs.

This disposition of the § 1962d–17(b) claim renders it unnecessary to discuss other points raised by the parties. Accordingly, Count IV will be dismissed for failure to state a claim upon which relief can be granted.

(b) *Written Agreements.*

Count V of the amended complaint alleges that defendants have violated § 221 of the Rivers and Harbors Act of 1970, 42 U.S.C. § 1962d–5b,[27] by failing to obtain *written* agreements of cooperation from participating non–Federal interests (public agencies created by Alabama and Mississippi) prior to commencing construction of the TTW. Finding there is no genuine issue of material fact, the court holds that defendants are entitled to prevail as a matter of law.

42 U.S.C. § 1962d–5b provides in relevant part that "the construction of any water resources project by the Secretary of the Army, acting through the Chief of Engineers, ... shall not be commenced until each non–Federal interest has entered into

---

**27.** (a) After December 31, 1970, the construction of any water resources project by the Secretary of the Army, acting through the Chief of Engineers, or by a non–Federal interest where such interest will be reimbursed for such construction under the provisions of section 1962d–5a of this title or under any other provision of law, shall not be commenced until each

non–Federal interest has entered into a written agreement with the Secretary of the Army to furnish its required cooperation for the project.

. . . . .

(f) This section shall not apply to any project the construction of which was commenced before January 1, 1972 ....

a written agreement with the Secretary of the Army to furnish its required cooperation for the project." § 1962d–5b(a). This provision, however, does not apply "to any project the construction of which was commenced before January 1, 1972." § 1962d–5b(f). Mississippi's statutory agency, Tombigbee River Valley Water Management District, was created on December 12, 1962, by Chapter 224, Mississippi Laws of 1962, codified in Miss.Code Ann. § 51–13–101, et seq. (1972), and on March 26, 1964, it adopted a resolution providing assurance of local contribution to TTW. Alabama's statutory agency, Tombigbee Valley Development Authority, was created in 1967 pursuant to Title 38, § 126 et seq. Code of Ala., and Amendment No. 270 to the Alabama Constitution, and on April 18, 1968, that district adopted a resolution of support to the project. These state agencies gave assurance that each would construct, maintain and operate highways, bridges and all highway relocations within the respective states affected by TTW. Neither agency entered into a formal written agreement with the Secretary of the Army to furnish the required cooperation. It becomes important, therefore, to determine if the date of commencement of TTW occurred after January 1, 1972, making it necessary for the Secretary of the Army to obtain written agreements.

On May 25, 1971, the President of the United States at Mobile, Alabama, presided over the dedication and groundbreaking of the project. Congress first appropriated construction funds of $1,000,000 for the fiscal year 1971 ending June 30, 1971. Pub. L.No. 91–439, 84 Stat. 890.[28] A portion of this appropriation was earmarked for the purchase of land at the Gainesville Construction area. In August 1971 the Corps of Engineers, using TTW–appropriated funds, acquired the first real estate in Greene County, Alabama, for the Gainesville Lock and Approach Channel. In September 1971, the project was halted by plaintiffs when they obtained an injunction from the United States District Court for the District of Columbia, which recited in a memorandum opinion that "[a]ctual construction of the Tennessee–Tombigbee Waterway has not yet begun." *EDF v. Corps of Engineers*, 331 F.Supp. 925, 926 (D.D.C.1971). In November 1971, the Secretary of the Army issued Corps circular EC 1180–2–12, providing, with specific reference to the applicability of § 1962d–5b, that "[c]ommencement of construction shall mean the first acquisition of real estate for the Project, or the execution of a construction contract, whichever occurs first." On August 4, 1972, the federal injunction was dissolved and the first contract was awarded September 22, 1972, for the construction of the Gainesville Lock and Approach Channel. In subsequent reports to congressional committees and others, Corps officials have stated that construction began in 1972. The Fifth Circuit Court of Appeals recently stated that "[a]ctual construction of the waterway began in 1972." *EDF v. Alexander*, 614 F.2d 474, 477 (5 Cir. 1980), *pet. for cert. filed* 49 USLW 3031 (Aug. 5, 1980). The correct references would be to *fiscal* 1972, which then began on July 1, 1971.

From the foregoing facts, it is clear that the Secretary of the Army in 1971 regarded construction of the TTW to have commenced with the first acquisition of real estate in August of that year. We believe this was a reasonable interpretation of § 1962d–5b, and it renders inapplicable the requirement that the Secretary obtain "written agreement" from the non–Federal participants in the TTW project. Contrary to plaintiffs' contention, the facts of what did occur in 1971 cannot be altered by out–of–context statements subsequently made by Corps officials or by a passing reference by the Court of Appeals in the course of discussing the channel authorization issue. No court has heretofore addressed the issue of the date of commencement of construction of this project based upon a full evidentiary record.

**28.** Fiscal year 1972, of course, commenced July 1, 1971. The second TTW appropriation, for fiscal 1972, was contained in Pub.L.No.92–134, 85 Stat. 365. *See* 467 F.Supp. at 897–98.

Moreover, it is evident that any delay in project commencement beyond January 1, 1972, was occasioned entirely by the preliminary injunction sought by plaintiffs and they are in no position to assert that § 1962d–5b became applicable when they obtained temporary injunctive relief designed in part to preserve the rights of the parties until final hearing. It is difficult for us to conceive of a plainer case of estoppel, and from the undisputed facts established in this case, laches bars plaintiffs from now raising this stale claim.

Accordingly, defendants are entitled to summary judgment on this issue, and Count V will be dismissed with prejudice.

## IV. FISH AND WILDLIFE

By Count XIII of their amended complaint, plaintiffs charge that defendants violated the Fish and Wildlife Coordination Act of 1934 (FWCA), 16 U.S.C. § 662, by not preparing and filing with Congress reports on the extent of wildlife loss and measures to be adopted to mitigate wildlife loss in constructing TTW. Defendants seek dismissal of this count on two grounds: first, that plaintiffs are barred by res judicata and collateral estoppel from relitigating an issue decided adversely to them in the prior suit; second, that plaintiffs have no *private right of action* under FWCA.

As to the first ground, plaintiffs respond by asserting that the "narrow issue" in the prior case was only whether the Secretary of Interior could delegate his functions under 16 U.S.C. § 662, and that new information as to lack of report filing has come to light since the completion of the first lawsuit. Their position on the second ground continues to be that compliance with FWCA is independently reviewable under the Administrative Procedure Act.

This court agrees with defendants on both grounds.

In the previous action, plaintiffs alleged, as a second cause of action, the Corps' failure to comply with FWCA. We dismissed the FWCA cause of action in a bench ruling for failure to state a claim by holding that this statute, among others, enacted long before the adoption of NEPA, did not provide a right of action for private parties. We stated that FWCA was passed to direct responsible federal officials to consult with other governmental agencies before carrying out a particular project and to furnish Congress data for its own legislative purposes. 348 F.Supp. 916, 921–22 n.4. On appeal, the Fifth Circuit, while addressing the FWCA claim on its merits,[29] ruled against plaintiffs, *EDF v. Corps of Engineers*, 492 F.2d at 1138. Since EDF, CLEAN and the plaintiff class charged violation of FWCA in their first suit, res judicata bars them from asserting a new cause of action upon the same statute. Having lost the cause of action on one theory, those plaintiffs may not resurrect it by now advancing new theories of statutory violation. To allow this would nullify the doctrine of res judicata. As previously found there is a basis for believing that the remaining plaintiffs were so closely identified with the prior litigation that they, too, are barred by res judicata. But, if res judicata does not apply, collateral estoppel precludes these other plaintiffs from attempting to litigate Corps compliance with FWCA since it was an issue that was actually litigated in the original action.

Additionally, most courts confronted with the question have held that 16 U.S.C. § 662 confers no private right of action, or at least there is no independent review of FWCA compliance when private parties also challenge compliance with NEPA's more comprehensive requirements. *EDF v. Corps of Engineers*, 325 F.Supp. 749, 754 (E.D.Ark.1971), *aff'd sub nom. EDF v. Froehlke*, 473 F.2d 346, 356 (8 Cir. 1972);

---

**29.** Although the Fifth Circuit addressed the claim on its merits, we do not interpret that was necessarily meant to constitute a finding that the FWCA provides a private cause of action. The appellate court did not address this issue, but rather concluded that the "short answer" to plaintiffs' contentions was on the merits. 492 F.2d at 1138.

*Sierra Club v. Morton*, 400 F.Supp. 610, 640 (N.D.Cal.1975), *aff'd in part, rev'd in part on other grounds, sub nom. Sierra Club v. Andrus*, 610 F.2d 581 (9 Cir. 1979); *County of Trinity v. Andrus*, 438 F.Supp. 1368, 1383 (E.D.Cal.1977). *Contra, Akers v. Resor*, 339 F.Supp. 1375, 1378 (W.D.Tenn.1972), *injunction cont'd*, 443 F.Supp. 1355 (W.D.Tenn. 1978), where the district court applied *both* FWCA and NEPA standards in reviewing the Corps' activity in constructing a water project.[30]

The Eighth Circuit in *EDF v. Froehlke, supra*, upheld the trial court's dismissal of a separate count in a complaint based on FWCA noncompliance where the counts also charged violation of NEPA. The Court of Appeals approved the reasoning of District Judge Eisele that "if the Corps complies with NEPA in good faith, it will 'automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately.'" 473 F.2d at 356.

■ We endorse the above reasoning. Any separate claim by plaintiffs that the defendants did not comply with FWCA is merged with and subsumed by their claim in those counts based upon NEPA. We therefore hold that defendants are entitled to judgment on the pleadings as to Count XIII on the ground that it fails to state a claim upon which relief can be granted.

## V. DISCHARGE OF DREDGED MATERIAL

Count XII of plaintiffs' amended complaint alleges violation of the Federal Water Pollution Control Act (FWPCA) as amended by the Clean Water Act of 1977, 33 U.S.C. § 1251 et seq.

The Aberdeen Lake navigation channel will require the excavation of approximately 5 million cubic yards of material, mainly consisting of sand and gravel; the Colum-

bus Lake navigation channel will require dredging of 30 million cubic yards of material; and the Aliceville Lake navigation channel will require the excavation of 15 million cubic yards of material. Furthermore, construction of the locks and dams will require excavation of approximately 23,500,000 cubic yards of earth. In addition, maintenance of the project will require excavation of over 500,000 cubic yards annually. Obviously, this material must be disposed of in some way. It is the method of disposal and the selection of disposal sites, particularly those sites which affect wetlands, to which plaintiffs object in this count. Both sides have moved for summary judgment.

Defendants first maintain that this count should be dismissed for lack of jurisdiction inasmuch as plaintiffs have failed to comply with FWPCA jurisdictional prerequisite. 33 U.S.C. § 1365(b) precludes citizen suits unless plaintiff, within 60 days prior to commencement of the action, gives notice of the alleged violation to the administrator, the state in which the violation occurred, and any other alleged violator. Defendants contend that plaintiffs failed to comply with this notice requirement. Plaintiffs maintain, first, that § 1365(b) is not jurisdictional and, second, that regardless of the jurisdictional effect of giving notice of a FWPCA claim, this court has jurisdiction under the general federal question jurisdictional statute, 28 U.S.C. § 1331.

■ The circuits are split as to whether the notice requirement in § 1365(b) is a jurisdictional prerequisite to suit. *Compare National Sea Clammers Ass'n v. City of New York*, 616 F.2d 1222, 1226 (3 Cir. 1980) (states that Third Circuit requires strict adherence to Act's notice requirement but notes contrary view), *petition for cert. filed; City of Evansville v. Kentucky Liquid Recycling*, 604 F.2d 1008, 1014 (7 Cir. 1979) (failure to comply with notice requirement precludes right of action under the Act), *cert.*

---

**30.** The Fifth Circuit has not decided the question. *See* note 29 *supra.*

*denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980), *with Friends of the Earth v. Carey*, 535 F.2d 165, 175 (2 Cir. 1976) (notice requirement to be construed flexibly), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1979). The Fifth Circuit apparently has not decided the issue, and we deem it unnecessary to do so since, even if the plaintiffs' notice was insufficient, we conclude that they may nonetheless invoke jurisdiction under 28 U.S.C. § 1331.

§ 1365(e) provides:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

We agree with the Third Circuit decision in *National Sea Clammers Ass'n, supra*, that § 1365(e) allows federal question jurisdiction under 28 U.S.C. § 1331 when, as here, the jurisdictional amount requirement is met. Indeed, any other interpretation would seek to negate the existence of § 1365(e). We therefore proceed to a determination on the merits of plaintiffs' claims.

(a) *Section 404 (33 U.S.C. § 1344).*

Section 404 of the FWPCA, as amended by the Clean Water Act of 1977, provides that a permit for discharging dredged or fill materials into navigable waters must be obtained from the Secretary of the Army after notice and opportunity for public hearings. Plaintiffs contend that this section and the regulations adopted thereunder (33 CFR § 209.145(g)) were violated, while defendants maintain that the regulations were complied with faithfully.

The regulations require that the following information appear in the notice:

(i) The name and location of the Federal project and proposed disposal site(s);

(ii) The citation of the law(s) under which the Federal project is to be reviewed (See paragraph (b), of this section);

(iii) A brief description of the Federal project and a description of the estimated type, composition and quantity of materials to be discharged, the proposed time schedule for the dredging activity, and the types of equipment and methods of dredging and conveyance proposed to be used;

(iv) A sketch showing the location of the Federal project including depth of water in the area and all proposed disposal site(s);

(v) A brief description of the existing use of properties immediately adjacent to the disposal area;

(vi) The nature, estimated amount, and frequency of known and anticipated related dredging and disposal to be conducted by others;

(vii) A statement as to whether the proposed disposal site(s) is (are) ones which has (have) previously been designated by the Administrator, EPA;

(viii) A list of Federal, State and local agencies with whom these activities are being coordinated;

(ix) A statement concerning a preliminary determination of the need for and/or availability of an environmental impact statement;

(x) Any other available information which may assist interested parties in evaluating the likely impact of the disposal of the dredged material;

(xi) A reasonable period of time, normally thirty days but not less than fifteen days from date of mailing, within which interested parties may express their views concerning the disposal of the dredged material.

(2) The following statement will also be included in the public notice:

Any person who has an interest which may be affected by the disposal of this dredged material may request a public hearing. The request must be submitted in writing to the District Engineer within ＿＿＿ days of the date of this notice and

must clearly set forth the interest which may be affected and the manner in which the interest may be affected by this activity.

(3) If the federal project involves the discharge of dredged material into navigable waters, the public notice shall also contain the following:

Designation of the proposed disposal site for dredged material associated with this Federal project shall be made through the application of guidelines promulgated by the Administrator EPA in conjunction with the Secretary of the Army. If these guidelines alone prohibit the designation of this proposed disposal site, any potential impairment to the maintenance of navigation, including any economic impact on navigation and anchorage which would result from the failure to use this disposal site, will also be considered.

A review of Public Notice No. 77–901 (Attachment A to Affidavit of Nathaniel D. McClure IV) leads us to conclude that the regulations have been followed. All required information is provided in the notice. Although the notice provided that a public hearing could be held upon request, no such request was made. Comments from EDF were responded to by the Corps. In short, we see no § 404 violation in the form of the notice.

Plaintiffs next attack the Corps' Statement of Findings (SOF) relating to the discharge of dredged material as violative of § 404 and the regulations adopted thereunder. Failure to follow these standards, plaintiffs argue, renders the agency's decision arbitrary, capricious, and not in accordance with the law. The question before us is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136, 153 (1971). The regulations provide the factors which must be considered.

The regulations recognize the importance of wetlands, 33 CFR § 209.145(e)(3)(i), and note that the cumulative impact on wetland alterations should be considered. *Id.* § 209.-145(e)(3)(iii). In this regard the SOFs state that "[t]he cumulative effect of this action upon the environment was considered and it was determined that it was in the national interest to proceed with this construction." It thus appears that the "cumulative effect" factor was considered.

The regulations also provide that disposal of dredged material in wetlands will not be performed

unless the District Engineer concludes . . . that the benefits of the proposed disposal outweigh the damage to the wetlands resource and the proposed disposal is necessary to realize those benefits. In evaluating whether a particular alternation is necessary, the District Engineer shall primarily consider whether the wetland resources and environment must be utilized in performing the dredged disposal, and whether feasible alternative disposal sites are available.

*Id.* § 209.145(e)(3)(iv). Plaintiffs argue that this section was not complied with. We disagree. The SOFs (attachments D–G of McClure's affidavit) clearly indicate that these factors were considered. In three of the SOFs (Columbus, Aberdeen and Aliceville Lake Navigation Channel SOFs) it is stated that "[s]ites were individually selected by an interagency selection team and alternate disposal sites were considered in the process of selection by the interagency field team." The SOF dealing with the Gainesville, Aliceville, Columbus and Aberdeen locks and dams adds that disposal "[s]ites were adjusted to minimize adverse effects on the environment." Furthermore, in the Aliceville Lake Navigation Channel SOF it is stated:

The disposal areas for dredged material have been located to limit the pumping distances for a hydraulic dredge to less than one–half mile wherever possible. The disposal areas have been located away from developed or settled areas and

on the low bank or cut bank where practical. They will be aesthetically oriented in a manner that will preclude blocking natural drainage, while at the same time utilizing natural drains for the management of return water.

These references lead us to believe that alternative disposal sites were considered and that the District Engineer concluded that utilization of wetlands as disposal sites was necessary. In addition, the SOF's state "[d]isposal will not have an unacceptable adverse impact on the aquatic resource." *See* 40 CFR § 230.5(b)(8). We thus conclude that the Corps considered all relevant factors in selecting its disposal sites.

 Plaintiffs next argue that the SOF findings do not have a basis in fact in the administrative record. Our standard of review is, of course, limited by § 706 of the Administrative Procedure Act–we may set aside the Corps' findings only if its action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In making the foregoing determination[ ], the court shall review the whole record or those parts of it cited by a party . . . ." *Id.* § 706. Neither party has produced the administrative record for our review, each stating that it was the burden of the other to do so. We conclude that plaintiffs have failed to meet their heavy burden of proving that the Corps' action was clearly erroneous.

"In order to upset the final agency decision, there must be a clear showing that such decision was improper. The burden of proving that the action was improper is on the party challenging the decision. It is well settled that there is a definite presumption of regularity in favor of the administrative decision." *Gables by the Sea, Inc. v. Lee,* 365 F.Supp. 826, 831 (S.D.Fla. 1973), *aff'd,* 498 F.2d 1340 (5 Cir. 1974), (per curiam), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). Ordinarily, of course, we would be required to examine the administrative record to determine the sufficiency of the Corps' findings. *See Citizens to Preserve Overton Park, supra.* We determine that this is unnecessary under the particular facts of this case.

As discussed *supra,* the burden of proving that agency action is arbitrary and capricious rests on plaintiff. Only the administrative record may be looked at to determine whether the agency's action had a basis in fact. *Id.* As stated in § 706, the court may rely on either the whole record or on those portions of the administrative record cited to it by the parties. The Fifth Circuit, noting the realities of cases such as this, has stated:

> [W]hile the *Overton Park* mandate does require that we base our review on the entire record before the agency, we do not interpret it to require that we plunge into the record unaided by the parties. The record's length is on the order of 10,000 pages, and it is both technical and poorly organized. Lest we make of this case a career, we must generally restrict our consideration to the parties' specific citations.

*State of Texas v. EPA,* 499 F.2d 289, 297 (5 Cir. 1974), *cert. denied,* 427 U.S. 905, 96 S.Ct. 3191, 49 L.Ed.2d 1199 (1976). Having failed to produce any sections of the administrative record showing insufficiency of the Corps' findings, plaintiffs have failed to meet their burden of proving arbitrary and capricious agency action.

---

**31.** The discharge of dredged or fill material as part of the construction of a federal project specifically authorized by Congress whether prior to or on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section, or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Protection Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

Furthermore, the failure of plaintiffs to produce any portion of the record, although extensive discovery has been undertaken in this lengthy and complex litigation and plaintiffs are well aware of the standard of review of agency action, leads us to conclude that plaintiffs are estopped from claiming insufficient factual findings.

We summarily reject plaintiffs' argument that § 1344(r) [31] requires defendants to file an EIS with Congress prior to further discharge disposal. The subsection provides not another requirement, but merely an alternative to compliance with some of the FWPCA requirements.

(b) *Section 401 (33 U.S.C. § 1341).*

Plaintiffs contend that § 401 (33 U.S.C. § 1341) [32] has been violated by the Corps' failure to obtain certification from the State of Alabama. It is undisputed that Mississippi has granted certification.

On September 1, 1978, the State of Alabama decided to waive the requirements of § 401. *See* D. Ex. 29 and Affidavit of Nathaniel D. McClure IV. Plaintiffs contend that § 401 does not allow affirmative waivers. We disagree. The section provides that a state shall be deemed to have waived its rights under § 401 if it "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year)." We do not interpret this to mean that affirmative waivers are not allowed. Such a construction would be illogical and inconsistent with the purpose of this legislation. "The purpose of the certification mechanism . . . is to assure that Federal licensing or permitting agencies cannot override State water quality requirements." S.Rep. No. 414, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News 3668, 3735. A state need not avail itself of this protection. If it fails to certify within a reasonable time, waiver is automatic. Thus, had the state simply ignored the certification request, plaintiffs could not complain if the permit was granted after a "reasonable" time. We therefore believe that a state may make an affirmative decision to waive § 401 certification. In any event, "the proper forum for judicial review of state certification is in state court." *Mobil Oil Co. v. Kelley,* 426 F.Supp. 230, 235 (S.D.Ala.1976).

Having determined that there is no genuine issue of material fact and that defendants are entitled to prevail as a matter of law, we dismiss with prejudice Count XII of the complaint.

---

**32.** (a)(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

## VI. AGENCY'S FAILURE TO PUBLISH REGULATIONS

By Count XIV, plaintiffs allege that defendants have violated § 3 of the Administrative Procedure Act, 5 U.S.C. § 552(a)(1), as well as a Department of the Army regulation, 32 CFR § 518.59, by failing to publish in the Federal Register various regulations, mandatory and interpretative materials, and other documents pertinent to the planning, design, justification and construction of TTW; that this failure to publish has caused plaintiffs irreparable injury; and that the project should be enjoined until defendants have published such materials. Both sides have moved for summary judgment on this issue.

Section 552(a)(1) provides that each agency, which, of course, includes the Department of the Army, shall currently publish in the Federal Register for public guidance certain information of enumerated categories.[33] This list covers virtually all information not specifically exempted by § 552(b), which exemption applies, *inter alia,* "to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The Department of the Army regulation upon which plaintiffs rely is cited below.[34]

Count XIV of the amended complaint fails to designate or describe any particular unpublished regulation which was required to be published. Plaintiffs, however, learned in 1977 and 1978 during discovery of at least three Corps of Engineers regulations which, to plaintiffs' knowledge, have never been published in the Federal Register. These include Reg. No. 1165–2–6–Water Resource Policies and Authorities: Evaluation of Redevelopment Effects; Reg. No. 1120–2–114–Survey Investigations and Reports: Water Improvement Studies–Navigation Benefits; and Reg. No. 11–2–24–Civil Works Activities Construction and Design. Federal defendants do not take issue that these regulations are unpublished but claim that they are internal agency guidelines used by Corps personnel in the preparation of reports as well as in reviewing ongoing projects and that as such their publication was required neither by the Administrative Procedure Act nor by the Department of the Army regulations.

Assuming without deciding that the three regulations as well as possibly others constitute information required to be published by § 552(a), the statutory remedy for noncompliance is "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." § 552(a)(4)(B). Although the Supreme Court in *Renegotiation Board v. Bannercraft Clothing Co.,* 415 U.S. 1, 94 S.Ct. 1028,

---

**33.** (a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

. . . .

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

. . .

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and
(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

**34.** In deciding which information to publish, consideration shall be given to the fundamental objective of informing all interested persons of how to deal effectively with the Department of the Army. 32 CFR § 518.59.

39 L.Ed.2d 123 (1974), held that the statutory remedy was not exclusive, it is not appropriate to enjoin agency action pending § 552 publication in cases where the complaining party has available to him the usual rights of discovery. *Id.* at 20–24, 94 S.Ct. at 1038–40, 39 L.Ed.2d at 137–40. That principle should apply here. As plaintiffs concede, they have through discovery obtained the regulations and materials which they claim have been improperly withheld from publication. In addition, they rely upon the unpublished documents to support their claims and do not show that the unpublished materials adversely affect their rights. Plaintiffs urge only that the failure of defendants to timely publish the regulations has significantly delayed their gaining knowledge of the materials and has interfered with their ability to promptly prosecute their claims. Having had full access through the discovery processes of this court to all unpublished material in the hands of the Corps of Engineers, plaintiffs show no irreparable injury arising from the nonpublication of any of the regulations in issue. Given these circumstances, we believe it would be an abuse of discretion to enjoin the construction of TTW, as an agency project, until defendants publish all materials required by § .552 to be so published.

We therefore grant summary judgment to defendants on Count XIV insofar as it denies injunctive relief to halt the construction of TTW, but without prejudice to plaintiffs' right to seek an order requiring the defendants to publish all heretofore unpublished regulations and other documents required by § 552(a)(1).

We find it unnecessary to discuss Count XV which sets forth no facts or claims of violations of law not contained in other counts.

Let an order issue accordingly.